(R.D. 11207)

PAUL MORRIS *v.* UNITED STATES

Entry Nos. 1022857; 908077; 77510.

(Decided July 18, 1966)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the defendant.

OLIVER, Judge: This case involves three appeals for reappraisement of merchandise consisting of various sets of imitation pearl necklaces and matching earrings, exported from Japan during the

period of December 1960 to June 1961. The three appeals were consolidated at trial (R. 2).

The merchandise was entered at the unit ex-factory prices appearing on the invoices, plus an item for casing and packing charges. These entered values did not include items specifically and separately listed on the invoices as shipping charges and buying commissions. In each instance, the entered values were advanced by the appraiser in returning a unit value, net packed, figure.

Neither party disputes the basis for appraisement adopted by the appraiser, that is, statutory export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. What is in dispute, as will be discussed more fully below, are the proper dutiable amounts representing such statutory value.

Section 402(b), Tariff Act of 1930, as amended, *supra*, provides as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

At the trial, plaintiff called as its only witness Mr. Paul Morris, the importer in this case. He testified that he had been in the business of importing costume jewelry for the past 16 years, importing on the average of 200,000 dollars' worth a year. He identified plaintiff's collective exhibit 1 as merchandise generally illustrative of the invoiced items in R62/11908, and plaintiff's collective exhibit 2 as merchandise representative of the invoiced items in R62/11913 except as to size. Plaintiff's illustrative exhibit 3 was received in evidence as a picture of the goods involved in R62/11909. The official papers in these appeals were received in evidence unmarked (R. 13). The witness further identified the Mitsuwaya Co., Ltd., a name appearing on the entry papers, as his purchasing agent in Japan, and the Nishida Pearl Manufacturing Co., Ltd., and the Fujii Pearl Manufacturing Co., which names also appear on the entry papers, as the Japanese manufacturers of the imported jewelry.

Concerning the procedure followed in acquiring this merchandise, Mr. Morris testified in substance as follows about his dealings with the Nishida company: Before going to Japan he wrote to the Mitsuwaya company explaining the size of the raw material he wanted

prepared by the makers as well as the different colors he desired. Upon arriving there, he would go to Nishida's factory accompanied by a representative of the Mitsuwaya company. At the factory, he worked with Nishida's sample maker and developed the designs, colors, and sizes he wished to purchase. Clasps for the jewelry items were obtained from the Sunada Manufacturing Co., Ltd., a metal manufacturer, and the cost was calculated into the price of the finished articles. It took approximately a week to 10 days from the time he first visited the factory to arrive at final prices. He personally placed the orders with Nishida and prices were quoted to him on an ex-factory basis with no restrictions being placed by the maker. However, Morris did request that they not sell this merchandise to anyone else.

Morris further testified that he had dealt with the Nishida company in this manner for about 6 years and that he followed substantially the same procedure in dealing with the Fujii Pearl Manufacturing Co. He explained that the only difference in negotiating with Fujii was the fact that they often accommodated him by bringing samples to his hotel in Kobe instead of requiring him to take a 6-hour train ride to their factory in the Okayawa district. Nishida, located in the city of Osaka, was under 2-hours' traveling time from Kobe. It was his understanding that the principal market for merchandise, like that represented by plaintiff's exhibits 1 and 2, was in Osaka and that the Okayama district was the principal market for merchandise like that contained in plaintiff's exhibit 3.

With respect to his relationship with the Mitsuwaya company, the witness stated that he had been dealing with them for approximately 16 years and that Mr. Ohta was the gentleman at Mitsuwaya with whom arrangements were made. These arrangements consisted of the Mitsuwaya company acting as interpreter in all negotiations with the makers, accompanying Morris to the factories, checking the goods when they were finally prepared, arranging for the transportation of the merchandise from factory to Kobe warehouse, to placement on board ship. For these services Mitsuwaya received a 5 percent commission on the ex-factory prices, plus $2.40 cents a case. It also received monies for the inland freight charges from the factories to Kobe. It was Morris' understanding, in answer to a question from counsel, that Mitsuwaya had nothing whatsoever to do with the purchase of the merchandise before the court except to see that it was properly shipped.

At this point in its case, plaintiff introduced into evidence two affidavits executed by Mr. K. M. Ohta of the Mitsuwaya company before the American Vice Consul in Japan. In plaintiff's exhibit 4, Mr. Ohta relates that he has been associated with Mitsuwaya Co.

of Kobe, Japan, for 16 years, becoming its president in 1958. In the first two paragraphs of this affidavit, he generally corroborates the agency arrangements testified to by Paul Morris. However, in the final paragraph, he indicates that on occasion his company has supplied materials to the makers for use in the manufacture of the articles purchased by Morris and that Morris was not a party to, or even aware of, this fact. Mr. Ohta also states that the cost of these materials "was settled when the merchandise made by the same materials were [sic] delivered to me from the manufacturers," but that, on orders placed on or after July 10, 1961, the manufacturers received full payment of the ex-factory prices agreed upon between them and Paul Morris. Plaintiff's exhibit 5 is a short affidavit by the same Mr. Ohta, dated August 16, 1962, and relates to defendant's exhibit D and will be discussed, *infra*, together with that document.

On cross-examination, Mr. Morris stated that he had made an average of three trips a year to Japan, since 1946, and that he generally placed orders for delivery on a 6-month or longer basis. He testified that, in ordering merchandise, he used an order book, a blank form from which was introduced into evidence as defendant's exhibit A. In the box marked "Purchase From," he would place Mitsuwaya's name. This was done 99 percent of the time while he was in Japan. In the following day or two, he would receive a sales note from Mitsuwaya signed by the maker. An illustrative sales note was received into evidence as defendant's exhibit B. On most occasions, he was present when the makers signed these notes. In reordering, he simply notified Mitsuwaya on a form such as exhibit A to repeat a previous order number with the same maker.

In making payment, the witness testified that he would calculate the total amount of his orders and open a letter of credit for the ex-factory amounts, the 5 percent commission, and approximately 2 percent for inland charges. Outside of the invoices themselves, he never asked Mitsuwaya to account for the actual charges. He stated that a written agreement was enacted 16 years ago between him and Mitsuwaya but he could not locate a copy. However, they had relied on the same verbal arrangements for the last 12 years. In answer to a question as to whether he had ever seen any merchandise that Nishida or Fujii sold to other American concerns, he testified that he never had. He further testified that he had no idea how other United States importers bought from other companies and that, in his opinion, the principal market for the merchandise was the place where it was made.

On redirect examination, plaintiff introduced illustrative exhibit 6 representing a Paul Morris purchase order. On the basis of this type of order, the witness testified that he received a sales note such as defendant's exhibit B. Finally, Morris answered in the affirmative

to a question from counsel asking him if the merchandise before the court was made in the same markets where it was sold.

When plaintiff rested, the Government introduced into evidence, as defendant's exhibit C, a report, No. 3–242, of Foreign Agent Albert J. Francis, Jr., dated May 12, 1961. This report is a five-page account of an interview conducted by Agent Francis with Mr. Ohta and Mr. Kishi at the offices of Mitsuwaya on April 27, 1961, which will be dealt with more fully below. Next, defendant introduced exhibit D, an affidavit of Mr. Ohta of Mitsuwaya sworn to before the American Vice Consul in Japan on October 5, 1961. In this document, Ohta recounts his dealings with both Paul Morris and one other American importer. He states, *inter alia*, that, prior to September 1, 1961, the ex-factory prices for this merchandise, in some items, included materials supplied to the makers, plus the making or fabrication charges; that, in some instances, the makers or "sub-contractors" received only this fabrication charge and that confirmations of sale were sometimes at ex-factory prices and sometimes at f.o.b. unit prices which included commissions and inland charges. He further stated that Mitsuwaya sometimes made a profit and sometimes realized a loss on these transactions and that the buyers were unaware that they were not acting as buying agents but were actually making sales and shipping as a principal. The affidavit also confirms that, on orders placed after July 10, 1961, Mitsuwaya received only its commission as buying agent.

Lastly, defendant's exhibit E was received into evidence. The first part of this exhibit is a letter, dated October 1, 1963, from Andrew P. Vance, Chief of the Customs Section of the Attorney General's Office in New York to Mr. Theodore W. Allis, Assistant to the Chief Counsel, Bureau of Customs, 201 Varick Street, New York, N.Y. The letter refers to a report, No. 3–291.1, of Customs Representative Smith B. Griffin, dated December 22, 1961, concerning an interview conducted with a Fujii Pearl Manufacturing Co., Okayama Prefecture, Japan. It requests that affidavits be obtained from this company and five others, including Nishida. The second part of this exhibit is a report, No. 3–242.1, dated December 2, 1963, from James O. Holmes, Acting Regional Customs Representative, Bureau of Customs, Tokyo, Japan. It states that affidavits were not obtained and, outside of clarifying the fact that report No. 3–291.1 referred to a different Fujii company than the one involved in this litigation, it contains mere terse, summary statements which, where relevant, are more fully covered by other evidence in this record. As such, I find this report unpersuasive and unnecessary to the determination of this case.

In rebuttal, plaintiff recalled Mr. Paul Morris. In explaining the background surrounding sales note No. 70, defendant's exhibit B, he identified plaintiff's exhibit 7 as a cable order for an additional 50

gross of merchandise originally contained in sales note No. 59, received in evidence as plaintiff's collective exhibit 8. Plaintiff's original order, No. 560, dated December 9, 1960, is also attached thereto. The witness also identified commercial invoice No. 208, dated November 29, 1960, and signed by Mitsuwaya, and sales note 26, signed by both Mitsuwaya and the Fujii Pearl Manufacturing Co. It was received into evidence as plaintiff's collective exhibit 9 and refers to entry number 882298 which was mentioned in report No. 3–242, defendant's exhibit C, as entry No. 88289. This exhibit will be dealt with below in connection with that report.

Finally, plaintiff offered in evidence exhibits 10 and 11 which purport to be statements made by Yoshihiko Nishida of the Nishida company, and Shigeo Fujii of the Fujii company, respectively. Each statement is accompanied by an English translation and the affidavit of the translator sworn to before the American Vice Consul in Osaka, Japan, and the American Consul in Kobe, Japan, respectively. The court granted the Government the right to attack these documents in any manner in its brief, thereby admitting them into evidence conditionally. Defendant argues, *inter alia*, that such statements do not amount to admissible affidavits within the purview of 28 U.S.C., section 2633. Upon examination of these exhibits in chambers, the court is in complete agreement with the defendant in this matter. The statements, whether signed or not, appear never to have been sworn to or affirmed before any oath-administering authority and certainly not before the officers of the American Consulate. The only documents executed and sworn to before these latter individuals were the certifications of the translators that the English translations of the Japanese statements were true and correct. Thus, I will afford no evidentiary value to these exhibits insofar as they cover unsworn or unaffirmed writings not amounting to admissible affidavits under section 2633, 28 U.S.C. (See *S. Parker Hardware Mfg. Corp.* v. *United States*, 47 Cust. Ct. 521, Reap. Dec. 10108, and case law cited therein.)

Plaintiff insists, as the nature of its offered proofs indicate, that the sole issue in this case involves the appraiser's determination to include in his appraised values the invoiced amounts for buying commissions and inland shipping charges. Defendant, on the other hand, takes the position that the appraisements cannot be considered separable and, thus, plaintiff is required to prove every material element for the export values it seeks. Separable appraisements arise where the appraisement itself is separate in form, i.e., where the appraiser indicates that he has adopted certain invoiced amounts and has added others to it, as was the case in *Kurt Orban Company, Inc.* v. *United States*, 52 CCPA 20, C.A.D. 851. They may also arise by the action of the parties where they stipulate that the appraiser has added certain

amounts in making his appraisement and limit the controversy to the proper inclusion or exclusion thereof for the court's determination. *United States* v. *Dan Brechner & Co. et al.*, 38 Cust. Ct. 719, A.R.D. 71; *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132. In this respect, it has long been recognized that counsel for both sides are empowered to stipulate away ultimate facts that might otherwise control the outcome of the controversy. *Pacific Trading Co.* v. *United States*, 19 CCPA 361, T.D. 45508. Furthermore, the making of stipulations should be encouraged insofar as their purpose is to save time and expense by clarifying the real areas of contention.

In the instant case, it is clear that the appraisements are not separable in form. Plaintiff contends, however, that the parties stipulated at trial as to the items in controversy before this court. Defendant disagrees and argues, by way of a set of computations appended to its brief, that the appraiser's figures are incapable of separate treatment. While I am inclined to agree with the plaintiff in this matter, I feel that a final ruling on this point is unnecessary to the determination of this litigation.

The burden on the plaintiff in this case is at least commensurate with its showing, by the preponderate or persuasive weight of the evidence, the *bona fides* of the commissions paid and the existence of freely offered ex-factory dealings exclusive of the inland charges incurred. *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590; *Albert Mottola, etc.* v. *United States*, 46 CCPA 17, C.A.D. 689. In an attempt to discharge this burden, plaintiff offered the testimony of the importer, Paul Morris. It was his understanding that the Mitsuwaya company acted exclusively as his buying commissionaire and that it functioned solely as interpreter between the makers and himself in these transactions, performing such services as receiving and paying for the manufactured merchandise, inspecting, recasing, and shipping it to the United States. However, not only does the affidavit testimony of the alleged buying agent fail to corroborate Morris in this but it strongly indicates, to the contrary, that Mitsuwaya took on the role of seller in some of its dealings with the plaintiff. In evaluating this affidavit evidence, the fact that the affiant Ohta described his company at one time as a principal (defendant's exhibit D) and another time as a buying agent (plaintiff's exhibit 4) is not in itself crucial on this question. As our appellate court recently admonished with respect to determining legal conclusions under the law of sales in the *Kurt Orban* case, *supra:*

\* \* \* it is necessary for us, as well as the Customs Court, to look not so much at the words used by non-lawyers as at the method of doing business which they describe and to determine, according to well-established legal principles, when, where, and by whom sales were made and at what price.

What is vital, therefore, are the following statements of Mr. Ohta in his affidavit of October 5, 1961 (defendant's exhibit D), relating, as they do, to Mitsuwaya's method of doing business with respect to transactions with Paul Morris, to wit: That prior to September 1, 1961, merchandise sold at ex-factory prices included, for some items, material supplied by Mitsuwaya to the makers, plus the making charges incurred; that in these instances the makers or subcontractors received only the fabrication charges and not the ex-factory amounts; and that Mitsuwaya realized a profit or loss on these deals.

As previously mentioned, these statements confer on Mitsuwaya the attributes of a seller not only in that it supplies the basic materials for production of the imported merchandise but also, so far as it receives and retains payment of the ex-factory amounts while paying out, in turn, a simple fabrication charge to the makers. As outlined above, the last paragraph of Ohta's affidavit of December 12, 1962 (plaintiff's exhibit 4), expresses substantial corroboration with this arrangement.

In an affidavit dated August 16, 1962 (plaintiff's exhibit 5), Mr. Ohta sets out certain errors in phrasing included in his first affidavit (defendant's exhibit D), namely, that in dealing with Paul Morris sales notes and sales confirmations were always listed on an ex-factory basis. Aside from this, the affidavit is noteworthy in that it permits the direct inference that all other statements contained in exhibit D are accurate.

In Mr. Ohta's first and final affidavits, he states that the importer Morris had no knowledge of Mitsuwaya's extended capacity in these arrangements. In light of this, defendant's exhibit C, a report of an interview between Treasury Agent Albert J. Francis, Jr., and Messrs. Ohta and Kishii of Mitsuwaya, represents the only other source of information before the court relating the details of Mitsuwaya's business dealings in these transactions. Furthermore, the information contained therein, where pertinent, tends to harmonize with and explain Ohta's affidavit testimony. In substance, the report relates the following: That Mitsuwaya, while not possessing any financial or managerial control over the makers, does supply material and advance cash to them; that in order to enter into long-term arrangements with Morris and one other American importer, it was necessary to try and purchase raw materials ahead of time, warehouse them, and deliver them to the makers when needed; the makers were not in a position to buy in quantity ahead of time so that they would not agree to set prices for longer than 6 months if they had to supply the materials; that when Mitsuwaya supplied the materials, the makers were paid only for their labor costs and that Mitsuwaya's records contained no individual con-

tracts or record of payments to the makers, nor was Mitsuwaya able to say what material went into which articles produced. The report further reveals that Mitsuwaya's profit in these dealings depended on its ability to acquire the materials before a contract was signed with the importer. However, if the contract were negotiated first and the cost of the raw material turned out to be greater than anticipated at the time of the ex-factory offering, then Mitsuwaya would absorb the loss.

The report refers specifically at one point to entry No. 88289 (corrected at the trial to read 882298) from the Fujii Pearl Manufacturing Co. It states that an invoice reviewed in connection with this entry indicated that item No. N-400 was sold at $17.20 per gross whereas Mr. Ohta's records show that it actually cost him $18 per gross. Plaintiff's collective exhibit 9 contains a copy of the commercial invoice in this entry and indicates that the $17.20 ex-factory price was an average price for 45 gross of item No. N-400 and 45 gross of item No. E-400. Whether the discrepancy was due to the documents examined in Japan or from the mistaken application of the $17.20 figure to the invoiced item No. N-400 alone, I deem it of little significance in contradicting the reported statements on Mitsuwaya's method of doing business.

The legal conclusion to be drawn from the entire record presented in this case is that the Mitsuwaya company, at the times when it supplied basic materials, acted in the capacity of seller to the importer, Paul Morris. Plaintiff's proofs do not attempt to isolate these occasions and evidently Mitsuwaya's records are incapable of it. Nevertheless, there is evidence that, where prices were to be set for over 6 months, Mitsuwaya was to supply the materials. There is also record evidence that the plaintiff generally dealt in 6-month or longer contracts (R.50). In these instances, the maker's commitment extended only to its labor or fabrication costs. Thus, it was of necessity left to Mitsuwaya to calculate, and in some cases, estimate or anticipate the total ex-factory amounts. Sellers are the ones ordinarily clothed with the responsibility for computing all the costs in arriving at final prices for the sale of merchandise. *United States* v. *Erb & Gray Scientific, Inc.*, 54 Cust. Ct. 791, A.R.D. 186, affirmed, April 7, 1966, *Erb & Gray Scientific, Inc.* v. *United States*, 53 CCPA 46, C.A.D. 875.

Plaintiff has sought to argue that the Mitsuwaya company, without interfering with its agency status, was free to enter into separate agreements with the makers to sell them the materials they needed. However, there is nothing before me to show that separate contracts were negotiated between the makers and Mitsuwaya but rather, quite the contrary, Mitsuwaya's records show no such agreements running between these parties. Moreover, it is stated in both the affidavits and

the Treasury report that Mitsuwaya *supplied* materials for fabrication and not that it *sold* them, and further, the report indicates that the makers would not be bound on so-called long-term contracts if they were to be responsible for the materials.

Furthermore, there is corroborated evidence to the effect that, on these occasions, the ex-factory contract price went directly to Mitsuwaya who, after making payment for fabrication costs, reaped the benefits or bore the burdens of the overall bargain. Such calculations of, and speculations in, the contract price are not actions commensurate with the existence of a buyer/agent relationship. Under a section dealing with the essential characteristics of agency relations, the Restatement of the Law of Agency (Restatement, Second, Agency § 13), comments thus:

> a. *Existence and effect of fiduciary duties.* The agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking. Among the agent's fiduciary duties to the principal is the duty to account for profits arising out of the employment, *the duty not to act as*, or on account of, an adverse party without the principal's consent, *the duty not to compete with* the principal on his own account. * * * [Emphasis added.]

Since no written agency agreement was produced and, more especially, since neither Morris nor Mitsuwaya relied on it in their dealings but preferred working with verbal understandings, only an agency by factual relation could possibly be shown. In such case, even though the principal intends to hire another as an agent and believes that the other agrees, nevertheless, circumstances may appear to indicate that the other does not so intend. Restatement, Second, Agency, section 15.

What emerges as apparent from the evidence in this case is that, on the occasions referred to above, Mitsuwaya ceased to function as the agent of the plaintiff and participated in the negotiations as prime contractor for the sale of this merchandise. In estimating costs entering into the ex-factory prices, it acted as an adverse party vis-a-vis its alleged principal, and by retaining the fruits of the bargain (less certain known fabrication charges) upon delivery of the finished goods, it assumed not only the risks of profit or loss but also the role of seller of the merchandise. This was accomplished, moreover, without the knowledge or consent of the plaintiff (R.42).

In concluding, as I do, that the record presented in this case fails to establish the *bona fides* of the commission charges incurred, it is equally evident that plaintiff's proofs have not shown the nondutiability of the inland freight. Mitsuwaya had its place of business in the port of exportation—Kobe, Japan. There is no indication that the

merchandise could be freely obtained, at the buyer's option, at a price not including freight charges to Kobe. Cf. *Kurt Orban* v. *United States, supra.* It was shown that Mitsuwaya did not have to account for these charges. However, beyond this, it was incumbent upon the plaintiff to indicate that ex-factory sales (or sales negotiated at the maker's factories), not the amounts but the practice, were in the ordinary course of trade and not limited to the particular dealings of this plaintiff. *United States* v. *Gitkin Co., supra.* This is so whether the plaintiff, as some of the evidence suggests, is considered to be a selected purchaser or not. Plaintiff's witness Morris limited his testimony to his own course of dealing and freely admitted that he was unaware of how other United States importers dealt with companies in buying similar merchandise (R.66).

Therefore, on the basis of the record before me, I find the following to be the facts:

1. That the merchandise herein consists of sets of imitation pearl necklaces and matching earrings, exported from Japan during the period covering December 1960 to June 1961.

2. That said merchandise was entered at the invoiced ex-factory prices, plus casing and packing, less itemized amounts for buying commissions and inland charges.

3. That the merchandise was appraised at total net value figures which represent f.o.b. port of exportation prices.

4. That on or about the dates of exportation the Mitsuwaya Co., Ltd., of Kobe, Japan, participated in the transactions for the involved merchandise in a manner inconsistent with the performance of a *bona fide* buying commissionaire.

5. That, on or about the dates of exportation, such or similar merchandise was not shown to be freely sold, in the ordinary course of trade, other than on an f.o.b. port of exportation basis.

I find as matters of law:

1. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement for the merchandise covered by the consolidated appeals in this case.

2. That plaintiff has not shown the nondutiability of the charges for buying commissions and inland freight and has, therefore, failed to overcome the presumption of correctness attaching to the action of the appraiser.

3. That the dutiable values in each instance are the appraised values.

Judgment will be rendered accordingly.