(R.D. 11641)

SHALOM BABY WEAR, INC. *v.* UNITED STATES

Entry No. 776561, etc.

(Decided March 20, 1969)

*Lane Young & Fox* (*William Whynman* and *James G. McGoldrick* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Charles P. Deem* and *Bernard J. Babb*, trial attorneys), for the defendant.

FORD, Judge: These appeals for reappraisement were consolidated for the purpose of trial and involve importations of boys' shirts exported from Japan between August 18, 1961 and June 22, 1963, and entered at the port of New York. The merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, and does not appear on the Final List published pursuant to said Customs Simplification Act. The appraisement modified the value declared by the importer in three ways. As

regards the merchandise covered by R61/24016, 6 cents was added to the declared invoice unit price of $3.79 per dozen and an additional 5 percent included. The appraised value was expressed as $3.85 per dozen plus 5 percent. As regards the merchandise covered by R62/8222, R62/10042 and R62/11174, 5 percent was added to the declared invoice price and the appraised value expressed as the invoice price plus 5 percent. As regards the merchandise covered by R63/8618, R63/8655, R63/8656, R63/10852, R63/12090, R63/12091, R63/12157, R63/12158 and R62/6520, the appraised value was expressed as a sum without reference to percentages. The sum, however, represented an advance of 5 percent.

The importer has accepted the appraised values except for the 5 percent addition explicit in the first two groups and implicit in the third. Plaintiff claims that the 5 percent represents a buying commission and challenges its inclusion in appraised value.

The first issue raised is whether the appraisements are separable. If the appraisements are separable, plaintiff may direct his attack to the inclusion of a particular component of the appraised value and leave the remaining elements of the appraisement unmolested and in a state of continuing validity. A judicial rule regarding the separability of issues in appeals for reappraisement approves of such a procedure if it is shown that the challenged portion of the appraisement is composed of a separate and identifiable sum whose treatment by the appraiser is the subject of dispute. *United States* v. *Gehrig, Hoban & Co., Inc.*, 56 Cust. Ct. 782, A.R.D. 204, *affirmed on appeal, United States* v. *Gehrig, Hoban & Co., Inc.*, 54 CCPA 129, C.A.D. 924.

I find that the matter in dispute has been sufficiently clarified to warrant the application of the rule of separability. It appears from the testimony of the examiner of the merchandise, Harry Fichtenbaum, called as a witness on behalf of the plaintiff, that in all the cases herein the addition of 5 percent to the increased invoice unit price or to the declared invoice unit price or the appraisement at a unit price which represented an advance of 5 percent was the result of treating a declared 5 percent buying commission as part of the price of the merchandise. Accordingly it is proper to confine the dispute herein to the issue of buying commission while maintaining the correctness of the remaining portions of the appraisement. *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371.

In light of the above the genuineness of the buying commission is the central issue of the case since a *bona fide* buying commission does not form part of the dutiable value of imported merchandise. *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T.D. 31007; *United States* v. *Bauer et al.*, 3 Ct. Cust. Appls. 343, T.D. 32627; *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T.D. 40958.

To support its burden of showing the *bona fides* of the buying commission, plaintiff called two witnesses. Victor Shalom, the president of Shalom Baby Wear, Inc., testified that an agreement existed between Shalom Baby Wear, Inc. (hereinafter referred to as Shalom) and Ezra Choueke of Osaka, Japan, providing that the latter shall represent Shalom in Japan as a buying agent whose services would be compensated at the rate of 5 percent of the ex-factory price of the merchandise. Plaintiff could not locate its copy of a 1957 written agreement between Choueke and Shalom & Co. (another Victor Shalom enterprise) which Mr. Shalom stated was extended by verbal agreement in 1960 to cover the instant relationship between Choueke and Shalom Baby Wear, Inc. Mr. Shalom proceeded to detail the duties of Mr. Choueke under the verbal agreement in effect regarding the merchandise in issue. Mr. Choueke's duties were to place orders, examine merchandise, take Mr. Shalom to various factories in his search for a manufacturer, interpret, negotiate documents and keep Mr. Shalom informed of developments. Mr. Shalom testified that Mr. Choueke performed these duties in connection with the merchandise before the court, all of which was covered by three orders given to the manufacturer, designated as SB113, SB117 and SB122.

A copy of order No. SB–113, dated September 21, 1960, was introduced in evidence as plaintiff's exhibit 1. It was placed with the manufacturer Kansai Fuhaku Seihin, K. K., hereinafter referred to as Kansai, by Mr. Shalom on the occasion of his visit to Japan and was delivered to the manufacturer at a conference at which Mr. Choueke and his assistant, a Mr. Shimada was present. The order bears the signature of Mr. Shimada as the buyer beneath a stamped phrase "For A/C of Shalom Baby Wear Inc." Mr. Shalom stated that the "SB" preceding the order number stands for Shalom Baby Wear.

In addition Mr. Shalom testified as follows, on cross-examination with regard to an additional role played by Mr. Choueke vis-a-vis Kansai, the manufacturer.

Q. How about the material, was there any authorization from you to him [Choueke] to supply material to Kansai?—A. In this particular instance there was.

Q. How was that authorization expressed?—A. As I said before, I told the gentleman from Kansai that we had figured out the cost of material and figured out the making charges and he put in his profit, that we wanted to keep the price at $3.73. In order to do so I was ready to give him—have him advance the money for the material.

Q. Let's see if I can straighten this out. You say you advanced money for the material. Isn't it a fact that you advanced the material itself?—A. I don't think—I just told Mr. Choueke we were ready to pay for the material if Mr. Choueke bought it himself or gave the other gentleman the money to buy the material,

I don't think it made any difference. The money was for our account.

Q. How did you know that the price at which this merchandise was available to you was $3.73?—A. We figured out the yardage, the present price of the material at that time, the prevailing price of the material and he gave me his making charge and profit what he wanted to make, Mr. Kansai.

Thus it appears from Mr. Shalom's testimony that Mr. Choueke obtained the material needed to manufacture the ordered shirts and supplied said material to the manufacturer. This was done because the manufacturer could not undertake the large purchase of material necessitated by orders of this magnitude and served to stabilize the price of material as a factor in the party's monetary calculations. Mr. Shalom also stated that payment was made to Kansai by means of a letter of credit drawn in favor of Mr. Choueke who, in turn, handled the payment. To Mr. Shalom's knowledge Mr. Choueke served only as a commission agent and did not sell merchandise for his own account.

The second witness called by plaintiff to clarify the relationship between the parties was Mrs. Polissa Choueke. She testified that she participated fully in her husband's business and was in charge of business correspondence, inspection of goods in factories and office documents. Mrs. Choueke testified at length regarding the services rendered by her husband and herself in filling Mr. Shalom's orders. Her testimony touched on the genesis of orders in sketches and designs sent by Mr. Shalom, the contacts with various interested manufacturers, the development of detailed garment specifications, the obtaining of fabric and garment samples, the presentation of such to Mr. Shalom on his visits to Japan, the selection of a manufacturer, the repeated inspection of the goods produced and the supervision of packing and shipping.

Mrs. Choueke testified that her firm acted only as a buying agent, did not have merchandise of its own, never acted as selling agent and received for the service rendered to Shalom a commission of 5 percent of the ex-factory price of the merchandise in question. She further testified that her firm had no interest in Kansai or any other manufacturer.

With regard to the means of supplying material to the manufacturer, Mrs. Choueke testified that her firm supplied such material with the knowledge of Shalom and was reimbursed by Shalom for such expenditures. These amounts in turn were deducted from the amount due to the manufacturer.

Defendant introduced in evidence as defendant's exhibit A, a customs representative's report, dated December 13, 1965, together with an

affidavit of one Schuich Nishiyama, president of Kansai Fuhaku Seihin K. K., the manufacturer herein.

The items of greatest interest in the affidavit of the manufacturer touch on the payments to him by Choueke, the supply of materials, and the role of the manufacturer. Three pertinent paragraphs of the affidavit are as follows:

> 5. Records of my company contain a copy of Order No. SB–113 (AT) 610 dated October 25, 1960 from Ezra Choueke to my company covering 5000 dozens spun rayon boys' western shirts. Records of my company also show that during the period October 1960 through May 1961 payment was made by Ezra Choueke to my company for No. 610–R boys' western shirts at a unit price of ¥488.80 per dozen for a total of 4940 dozens shirts. The price of ¥488.80 per dozen represents only the making charge, plus export packing, plus inland freight from my factory to a Choueke designated warehouse in Kobe. The cloth material was furnished by Ezra Choueke and no money was exchanged between my company and Choueke for the material furnished my company by Choueke.
>
> *    *    *    *    *    *    *
>
> 7. Records of my company contain a copy of an undated Order No. SB–122 from Ezra Choueke to my company covering Western Shirts (AT 614–R). This order actually covers shipments made by my company to Ezra Choueke during 1963. Records of my company also show that during the period March through July 1963, the price of boys' western shirts from my company to Choueke was ¥1,350 per dozen shirts, and 4992 dozens boys' western shirts were actually delivered by my company to Ezra Choueke. The price of ¥1,350 per dozen included the making charges, plus export packing, plus inland freight from my factory to a Choueke designated warehouse in Kobe, plus the cost of the cloth. My company did not actually pay for the cloth. Ezra Choueke furnished the cloth and paid for the cloth. The cost of the cloth was deducted from the ¥1,350 per dozen price from my company to Ezra Choueke. Records of my company show that during the period March through June 1963, a total of ¥3,273,239 was deducted from amounts due my company by Ezra Choueke because of the cloth furnished by Choueke and paid for by Choueke, since costs were included in price of ¥1,350 per dozen from my company to Choueke. The only difference between the method of doing business with Ezra Choueke during 1963, as compared to 1960, 1961, and 1962 was that Choueke, during 1963, had requested that we include the value of the cloth in invoices from my company to Choueke even though we did not pay for the cloth nor did we receive payment for the cloth from Choueke.
>
> *    *    *    *    *    *    *
>
> 11. The only relationship that existed between my company and Ezra Choueke is that my company has performed sewing services for Choueke on Choueke's material.

The report of the customs representative accompanying the above-mentioned affidavit contained the following supplementary information regarding the relationship between Kansai and Choueke:

> Mr. Nishiyama volunteered the information that due to lack of funds on his part and in the absence of any prior business translations with the cloth manufacturers, he was compelled to ask Ezra Choueke to pay for the cloth material "as a matter of convenience." Mr. Nishiyama informed me that had he had the money to buy the material, he would have paid for the cloth himself rather than have Ezra Choueke act as an intermediary to furnish the material to his company.

> Mr. Nishiyama indicated that although no money was exchanged between his company and Choueke for the cloth material involved, he felt that the material was purchased by his company because Ezra Choueke paid for the materials "in his behalf" and the costs of the cloth were deducted from amounts which were due his company by Choueke, since such costs were included in the price of ¥1,350 per dozen from his company to Ezra Choueke.

> However, in response to my specific request, Mr. Nishiyama agreed to sign an affidavit stating the facts concerning his actual method of doing business with Ezra Choueke in connection with the transactions relating to the boys' western shirts under consideration.

It would appear from a review of the testimony that plaintiff has established the existence of the indicia of a principal-agent relationship between itself and Ezra Choueke. The elements of such a relationship are the agreement between the parties, the right of the principal to control the conduct of the agent with respect to the matters entrusted to him, the correlated undertaking of the agent to perform certain services for the principal and the performance of such duties in a manner consistent with fiduciary responsibilities. All of the above are abundantly supported by the testimony of plaintiff's witnesses which is replete with the details of services performed by Choueke for Shalom.

The sole question remaining is whether certain attacks made by the defendant on the authenticity of the relationship are enough to show that the principal-agent relationship was either without substance or was violated by the agent and destroyed in connection with the instant importations.

One of defendant's contentions is based on the invoice covered by R61/24016 and can be expressed as follows: The appraised value is $3.85 per dozen (leaving aside the 5 percent). The purchase price from Kansai, arrived at by dividing the number of shirts into the f.o.b. price listed on the invoice yields a price per dozen of $3.79. Thus Choueke is shown to have received, in addition to the purported 5 percent commission, a sum equal to the difference between the price at which the goods were bought and the price at which they were sold, which sum is clearly a seller's profit and reveals him to be a seller.

This attack, however, is grounded on a false premise, namely that the $3.85 per dozen appraised value is the sum declared by the plaintiff. Were this so, Shalom and Choueke could be saddled with the resulting internal discrepancies of the invoice and the inferences arising therefrom. Here, however, the $3.85 represents an advance by the appraiser which plaintiff has only consented to and which is an unlitigated sum separate and apart from the 5 percent buyer's commission which is the subject of this contest. The purported profit thus generated is not genuine.

Defendant also attacks the existence of an agency relationship by suggesting that the witnesses were not clear as to which sum the 5 percent commission was to attach. I am of the opinion, however, that a full study of the testimony points clearly to the ex-factory price as the basis of the commission.

Finally, defendant raises questions centering on the supplying of material to the manufacturer by Choueke, which questions, though not fully expanded, I consider the most worthy of discussion and elucidation. It appears that Choueke supplied the material to the manufacturer and on the three orders involved herein, the manufacturer deposed that he received payment for a sum less than the sale price to Shalom. Here we begin to touch on a practice which can, in certain situations, be destructive of the principal-agent relationship and can begin to place the agent in the role of seller in his own right.

In the recent case of *Paul Morris* v. *United States*, 57 Cust. Ct. 585, R.D. 11207, Judge Oliver, in a thorough and well-reasoned opinion which deserves close scrutiny, found that a principal-agent relationship had been destroyed on those occasions when the agent supplied basic materials to the manufacturer and in the existing situation transferred to himself such seller's attributes as subjection to fluctuating profits or losses. As a consequence of his undisclosed involvement in the supply of materials, the agent in *Paul Morris* assumed an interest adverse to that of his principal. The principal would be interested in minimizing the estimate of cost of materials in the negotiations leading to the fixing of a contract price, while his agent, hopeful of obtaining supplies at a low price, might be thought to desire a large estimate of supply cost thus obtaining for himself the difference between estimated and actual cost. Such actions clearly breached the agency agreement.

The present fact situation, however, differs in one all-important respect; the supplying of materials herein was done with the full knowledge and consent of the principal and the agent stood to gain no profit or bear no loss in connection with such supply. This fact is clearly indicated by the testimony of plaintiff's witness. The procedure

herein is consistent with the existence of a buying agency, in fact, in light of the business exigencies involved, it was essential to the task of obtaining the merchandise for Shalom. Only by securing the material at one time for the manufacturer could Shalom and Choueke be protected against rising material prices and only thus could they obtain a single price for shirts which were to be manufactured over a period of months.

In the light of the above, I find that the payment to Kansai of a sum less than the total invoice price, as indicated in Mr. Nishiyama's affidavit, is the logical outgrowth of the furnishing of the material by Shalom and Choueke, and the deduction of such sums from the amount to be paid to Kansai was not an indication that Kansai merely fabricated shirts from material owned by Choueke, which shirts Choueke then sold to Shalom.

I also wish to note that in the process of determining the realities of a business relationship, the courts should look to the actual methods and incidences of doing business and not to the characterizations given to the relationships by the parties. *Kurt Orban Company, Inc.* v. *United States*, 52 CCPA 20, C.A.D. 851. Thus I give little weight to the statements in Mr. Nishiyama's affidavit which attempt to characterize Kansai's relationship with Choueke. Rather I find that the facts recited in that affidavit, insofar as they relate to the actual course of doing business, do not support a conclusion that Choueke was an independent seller in his own right. When viewed in the light of the complete context of business dealings, as related at length by Mr. Shalom and Mrs. Choueke, the *bona fides* of the buying agency herein is unshaken.

In view of the foregoing, I find as matters of fact:

1. The merchandise involved herein consists of boys' western shirts exported from Japan between August 18, 1961 and June 22, 1963.

2. Said merchandise does not appear on the Final List published as provided for in the Customs Simplification Act of 1956, 93 Treas. Dec. 14, T.D. 54521.

3. The merchandise was appraised on the basis of export value as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

4. The merchandise covered by R61/24016 was appraised at a value of $3.85 per dozen plus 5 percent packed.

5. The merchandise covered by R62/8222, R62/10042 and R62/11174 was appraised at a value of $3.87 per dozen plus 5 percent net packed.

6. The merchandise covered by R62/6520 was appraised at a value of $4.06 per dozen net packed while the merchandise covered by

R63/8618, R63/8655, R63/8656, R63/10852, R63/12090, R63/12091, R63/12157 and R63/12158 was appraised at a value of $3.99 per dozen net packed.

7. That those appraisements expressed herein as a single figure are composed of the original declared value and an addition of 5 percent.

8. That in all cases the addition of 5 percent was the result of adding to the invoice amounts, a figure declared on said invoices to be the buying commission payable to the shipper, Ezra Choueke.

9. That with regard to the merchandise herein the firm of Ezra Choueke of Osaka, Japan, participated in these transactions as a *bona fide* buying commissionaire.

I, therefore, conclude as a matter of law:

1. That export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement.

2. That the buying commission of Ezra Choueke, consisting of 5 percent of the ex-factory price, is not properly part of the dutiable value.

3. That the appraised values of the imported merchandise less the 5 percent specified in findings of fact Nos. 4 and 5 and less 5 percent of the sums specified in findings of fact No. 6 are the proper dutiable values of the merchandise.

Judgment will be entered accordingly.