(R.D. 11224)

## Fine Arts Bag Co. *v.* United States

Entry Nos. 864428; 954340.

(Decided October 10, 1966)

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* and *Richard C. Meade* of counsel) for the plaintiff.

*J. William Doolittle*, Acting Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Nichols, Judge: These appeals for reappraisement, consolidated at the trial, involve handbags or baskets of reed or rattan, coated with polyvinyl chloride, exported from Hong Kong in 1961 and 1962.[1]

---

[1] This case was heard before me at New York on January 11 and March 15, 1965, and was submitted on the latter date. Plaintiff's brief was filed on September 10, 1965, and defendant's brief on June 28, 1966.

They were appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at the invoiced unit values, plus the items marked "X," that is, a so-called buying commission and charges for inland freight, insurance, storage, haulage, and lighterage. There is no dispute as to the proper basis of valuation, but plaintiff claims that the merchandise was freely sold or offered for sale at the ex-factory unit prices and that the so-called buying commission and other charges are not part of export value.

At the trial, Dikran Missirlian, a partner of Fine Arts Bag Co., the plaintiff herein, testified that he travels to Hong Kong to purchase merchandise for his firm; that his first trip was made in 1960, and that he bought the involved merchandise there in 1961. He had observed travelers carrying rattan bags covered with plastic, was interested in buying them at wholesale, and noticed that Nathan Rattan Furniture Co. had such merchandise. He went there and asked the manager, Mr. Chimen Tsang, whether he could place an order. Mr. Tsang took him to the place of business of Kwong Tai Cheong, the manufacturer, and an order was placed through Nathan Rattan Furniture Co., which firm was retained as representative of Fine Arts Bag Co.

A copy of an agreement between Fine Arts Bag Co. and Nathan Rattan Furniture Co. was received in evidence as plaintiff's exhibit 1. It is undated but purports to be effective as of July 1, 1961. The witness testified that it was either signed by him while he was in Hong Kong in July of 1961 or was sent to him and signed within a month thereafter. By the agreement, Fine Arts Bag Co. appointed Nathan Rattan Furniture Co. as its buying agent. It recites:

Nathan Rattan Furniture Co. will visit manufacturers in Hong Kong, collect samples, submit said samples to Fine Arts Bag Co., provide regular reports pertaining to the market and quote prices at which the merchandise may be purchases [sic].

Upon instruction from Fine Arts, Nathan Rattan was to place orders with manufacturers, inspect merchandise, and arrange shipment, for which it was to receive a buying commission of not less than 10 percent. It was provided that Fine Arts would purchase on the basis of ex-factory prices, plus additional charges totaling the final cost, and that consular and commercial invoices were to be prepared in United States dollars on the basis of ex-factory prices.

The purchase order and confirmations for the within merchandise were received in evidence as plaintiff's collective exhibits 2 and 3. The confirmation in each case includes the following:

We do hereby state that above merchandise which is manufactured in my plant is freely offered for sale to all purchasers on an ex-factory basis for exportation to the United States. Any purchaser that wishes

to purchase on this basis may do so at prices prevailing at the time of purchase.

KWONG TAI CHEONG<br>Gilman Zang [Tsang]

Mr. Missirlian testified that he had placed orders with Nathan Rattan for other types of merchandise, such as artificial plastic flowers, evening bags, and beaded bags. He had never seen any bags manufactured in the place of business of Nathan Rattan and did not deal with the firm as a manufacturer. He said it did manufacture rattan furniture, though he had never seen its factory.

Mr. Missirlian stated that Chimen Tsang is the name of the manager of Nathan Rattan Furniture Co. and that Gilman Tsang is the manager of Kwong Tai Cheong; that they looked like brothers. Harry Tsang, a son of Chimen Tsang, was employed by Fine Arts Bag Co. "this year." The witness said that, as far as he could determine, Nathan Rattan and Kwong Tai Cheong were different companies. They had their own checking accounts and different places of business. He asked them "because they being brothers" he "was a little suspicious it might be the same company." They said they registered separately and the companies were different.

An affidavit of Tsang Loy Kee was received in evidence as plaintiff's exhibit 4. It is stated therein that affiant is assistant manager of Nathan Rattan Furniture Co. and has held that position since September 1, 1960; that the company acts as purchasing agent for Fine Arts Bag Co. and has negotiated with various manufacturers in connection with purchases for that firm; that it investigates market conditions, transmits market reports, inspects merchandise, prepares shipping documents, receives funds, and pays manufacturers, all for the account of Fine Arts. For these services it receives commissions. The affidavit also states:

(3) * * * this company does not own or control any of the manufacturers from whom we purchase for the account of Fine Arts Bag Co., nor does this company remit to or share with said manufacturers any part of our commissions received from Fine Arts Bag Co. This company does not receive or share in any part of said manufacturers' profits.

(4) All purchases for the account of Fine Arts Bag Co. are made at ex-factory prices and on an ex-factory basis. * * * All invoices prepared by this company have truly reflected the agreed ex-factory prices, the shipping and inland freight charges, and our commissions.

(5) At no time has this company acted as a seller of merchandise to Fine Arts Bag Co. At all times our relation-ship with Fine Arts Bag Co. was solely as purchasing and shipping agent.

An affidavit of Gilman Tsang was received in evidence as plaintiff's exhibit 5. It is stated that affiant is the manager of Kwong Tai Cheong and has held that position since 1950; that the business of the company is the manufacture and sale of ladies' handbags and similar merchandise; and that sales to American importers are conducted through agents. It is also stated:

(3) That the merchandise which we have sold to Fine Arts Bag Co., 10 West 33 Street, New York, New York, U.S.A., through their agent, Messrs. Nathan Rattan Furniture Co., was sold on an ex-factory basis and at ex-factory prices. This company's responsibilities in connection with said sales was limited to delivery at the place specified by the purchasing agent, and this company had no responsibility for shipping the merchandise to the vessel.

(4) This company has never limited its sales to any particular purchaser. Any purchaser is free to purchase from us. No restrictions are placed upon the disposition or use of the merchandise.

(5) We offer and sell our merchandise on an ex-factory basis since this is the most practical and convenient method of sale. We prefer to rely upon experienced purchasing agents to effect the actual exportation of the merchandise and to prepare all necessary documents.

(6) We are an independent business organization and are not owned or controlled by Messrs. Nathan Rattan Furniture Co. or any other purchasing agent. We do not share our profits with any purchasing agent nor do we share in the commissions received by any purchasing agent.

Defendant offered in evidence a report of Customs Representative Perry J. Spanos, dated January 22, 1965, to which are attached several exhibits including a report of Treasury Representative Frank W. Hammar, dated December 1, 1955. The attached documents indicate that both Kwong Tai Cheong and Nathan Rattan were and are owned and controlled by the Tsang family; that various members of that family are partners in the two firms; that some are partners in both and at times some retire from one and go into the other. According to statements made by Mr. Tsang Chi Man [2] to Mr. Spanos, although each firm is managed and operated independently "in the long run, profits or losses in either one of the companies affect the family." Mr. Gilman Tsang told Mr. Spanos that the firms are owned presently by five brothers and "all profits are ultimately divided equally."

Mr. Spanos further reported that Mr. Tsang Chi Man, manager of Nathan Rattan, said: Nathan Rattan does not own a rattan factory but acts as the shipper for merchandise manufactured by Kwong Tai Cheong. It realizes a profit "by buying merchandise from the factory at lower unit values, and re-invoicing same to U.S. importers at

---

[2] Evidently the same person as the "Chimen Tsang" referred to by Mr. Missirlian.

higher prices." Regular shipments of rattan baskets have been made to Fine Arts Bag Co., Island Spun Co., Straw Bag Fashions, and Sears and Roebuck Co. Such articles are invoiced on f.o.b. unit values, net, packed, with the exception of shipments to Fine Arts which are invoiced at ex-factory prices with buying commission and shipping charges added. Mr. Tsang explained:

* * * Fine Arts Bag Co. is the oldest and largest customer, and it was originally agreed "back in 1961" that all quotations, orders and invoices would show ex-factory unit values plus 10% commission plus "about 3.5%" shipping charges. * * * Mr. Tsang further stated that the original Contract No. 105 was negotiated and payments were made at the total F.O.B. values, but "Dick [Mr. Missirlian] insisted in the listing of ex-factory prices".

Mr. Gilman Tsang, manager of Kwong Tai Cheong, stated further to Mr. Spanos, that, until 1963, the entire production of the factory (except for a small quantity sold locally) was sold to Fine Arts through Nathan Rattan. Since 1963, merchandise has been exported directly to Island Spun Co., John Wind Co., and a few smaller customers. He said that all sales for export, even those made through Nathan Rattan for Fine Arts, were made on an f.o.b. basis. "Sales have never been made on ex-factory." These interviews took place after plaintiff had rested and before the trial resumed for defendant's case; I discuss the circumstances below.

According to the Hammar report, dated December 1, 1955, Kwong Tai Cheong abandoned the production and collection of rattanware in 1954 and began filling its orders for exportation by purchasing from Nathan Rattan. Quotations were f.o.b. Hong Kong; the merchandise was not offered ex-factory.

A letter on Nathan Rattan stationery addressed to Fine Arts in New York and signed by Nathan Rattan and countersigned by Fine Arts by D. Missirlian, dated June 22, 1962, a copy of which is attached to the Spanos report, states:

That in case Nathan Rattan Furniture Company is not considered by U.S. Custom as our representative and buying agent as per our agreement of July 1st, 1961, but considered as a manufacturer, and due to this fact, Fine Arts Bag Company, pays additional duties on the 10% commission and other charges, then Nathan Rattan Furniture Company must pay to Fine Arts Bag Company one and half per cent on the entire shipment of Contract No. 105.[3]

Exhibit E attached to the Spanos report is a letter to Nathan Rattan from Fine Arts by Mr. Missirlian stating, among other things:

* * * While I was in Hong Kong, we decided first on F.O.B. prices and of course, according to this, the total amount of all your invoices

---

[3] Exhibit 1 (the agreement between Nathan Rattan and Fine Arts) contains no number and the confirmations here refer to sales contract Nos. 101 and 102 (exhibits 2 and 3).

should amount to this F.O.B. price total. In other words, when you make your invoice, you figure first on ex-factory price and later you add on your 10% commission and plus other charges, these three (3) charges should amount to the total of the F.O.B. prices. * * *

I first consider the admissibility of and weight to be given to the Spanos report and attached documents. They were received at the trial under the following circumstances:

At the close of the plaintiff's case, January 11, 1965, defendant requested a continuance until March to make it possible for it to obtain a foreign agent's report to supplement and bring up to date one dated 1955 which it already had. It said the earlier report contradicted plaintiff's testimony but needed updating. It pointed out it had received the affidavits only the preceding Friday, so investigation before trial had obviously been impossible.

At the resumption in March, defendant offered the new report and rested. Plaintiff objected only to certain portions: to the Hammar report of 1955 which was attached to the new Spanos report, as its exhibit A, to references in the report to its exhibits D, E, and F, and to these exhibits themselves. The ground assigned was that these materials were too remote in time from the importations at bar to be relevant evidence. The court overruled these objections but stated it would disregard the material objected to if it found such material irrelevant. The report contains copies of two official Hong Kong Government documents with copies of certificates by the United States Consul. Presumably plaintiff waives nonproduction of the originals of these.

In *Fine Arts Bag Co.* v. *United States*, 56 Cust. Ct. 597, Reap. Dec. 11128 (decided February 3, 1966), the court received similar reports made at the behest of the Assistant Attorney General and based a decision unfavorable to the importer upon them.

Under date of March 22, 1966, there appeared the opinion in *United States* v. *Gehrig, Hoban & Co., Inc.*, 56 Cust. Ct. 782, A.R.D. 204. (Appeal 5253 pending.) Though stated to be the decision of the court, it was then concurred in by no other judge. At the time of trial of this case, it was not the basis of any action, objection, or motion by counsel, nor could have been, inasmuch as its published expression was a year in *futuro*. Nevertheless, because of it the court feels obliged to review its own rulings in this case.

The opinion says, to summarize briefly, that the Congress intended the exception to the hearsay rule for customs agent's reports (28 U.S.C., § 2633) only for such reports prepared in line of duty. It cites the Customs Manual, section 27.38 to show that investigations by agents are only to develop information for use by other branches of the Customs Service. It infers that investigations to develop information for use in customs litigation are outside the line of duty and,

therefore, not within section 2633. These observations, ably expressed, should be read in their entirety before one undertakes to weigh their full impact.

This court's proceedings in this case obviously are irreconcilable and, if the above views are correct, they should be undone in some way or other.

The Customs Manual is, however, a weak reed for the argument to depend on. It does not purport to be law or regulation, but only internal operating instructions, not superior in authority to directions, possibly conflicting, which the Commissioner might issue *ad hoc* from time to time. Moreover, the manual itself says in section 27.42(b) "Other reports may be called for from time to time by the deputy commissioner in charge of investigations."

It would seem that so far from investigation of issues developed in litigation being outside the line of duty of customs agents, section 2633, by its own terms, expands that line of duty to make it include litigation. I construe that section as a recognition that the hearsay rule would impose unusual difficulties on a court having to resolve, as in appraisement, so many questions to which the answers could only be found in foreign countries. As the congressional solution, not only is the hearsay rule in part waived, but the officials referred to in section 2633 are marshalled as helpers of the court, although they may be unable to come in and testify in the conventional way. It is up to the court to use this help properly.

The *Gehrig, Hoban* opinion appears to be on solider ground in stressing that the hearsay exceptions in section 2633 do not exonerate the court from all responsibility for policing the receipt of hearsay evidence and controlling so far as possible the abuses the rule was devised to guard against. While the 1930 Act was pending, a Memorandum of Court Decisions Affecting the Tariff Act of 1922 was prepared for the use of the Committee on Ways and Means of the House of Representatives. It stated as to section 501 (p. 77) :

> This section states that in finding value, affidavits of persons whose attendance can not reasonably be had, price lists, catalogues, reports or depositions of consuls, special agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be considered.

> This language leaves a consideration of the documents solely to the discretion of the Judge trying the case. Should not the language be changed so that the provision will read "shall be received in evidence" instead of "may be considered"?

The Congress, evidently thinking that exercise of discretion by trial judges was of some value, allowed the words "may be admitted" to stand.

In the instant case, if the court had refused a continuance stated to be for further investigation or had excluded the investigation report when offered (it was made, except for Mr. Hammar's 1955 portion, as appears on its face, entirely between the starting and continued date of the trial), there would have been no way to test or refute the plaintiff's two affidavits, themselves admitted only by grace of section 2633. No cross-examination of an affiant is possible, but the permitted investigation may be considered some sort of substitute. The *Gehrig, Hoban* view, as I understand it, if applied here, would have opened the doors wider to hearsay evils instead of closing them.

It is evident, however, that an investigation by agents before the start of litigation will command much more confidence than one that comes later. At the earlier time, the "client," the Bureau, to fulfill its own responsibilities is under so strong a need for impartial fact gathering, whatever result it leads to, that an exception to the hearsay rule stands fully justified. After the Bureau has become, in substance, if not name, a litigant, the court must lose much of its readiness to rely on the uncorroborated, unsworn say-so of any Bureau employee thereafter made. This is no reflection on the agents, who are honorable men. Few of us judges would care to have important issues decided according to our unaided recollection of what we think we heard others say.

Turning to the agent's report herein, it shows that Agent Spanos interviewed on January 21 and 22, 1965, two persons and attributes to them the statements already summarized which, if believed, are fatal to the appeal before me. Not only do they impeach plaintiff's affidavits, but they stand as substantive evidence of themselves.

There is nothing to show that the two Chinese gentlemen were warned that there existed other statements that were in conflict with what they were saying. The officer's report of what they said is obviously not verbatim and nowhere states it is complete.

Of course, customs agents abroad have no compulsory powers. However, those in the business of exporting to the United States know the possible adverse consequences of getting a reputation of not cooperating with the United States Customs representatives.

With all respect, I think that evidence of this kind, on vital, contested issues, offers a maximum concentration of the evils the hearsay rule was intended to guard against and a minimum of assurance that, though hearsay, the evidence is dependable.

But the investigation also, as stated above, developed material from official sources: copies of the signed business registration certificates of the two Hong Kong companies here involved and also copies of correspondence between plaintiff and the Chinese companies involved. I am not going to rule the oral interviews inadmissible because, among

other reasons, they were not included in plaintiff's objection. I would assign them minimal weight and agree with the adverse comment upon them in plaintiff's brief, except for the fact that other evidence corroborates them on the points I consider most important.

In order that these observations may not be construed to hamper future investigations I add this: in case of an investigation in the midst of trial, the nature of the instructions to the customs agent might make a difference. Mr. Spanos' report affords some internal evidence he supposed he was making a routine value investigation for general customs purposes, and there are no references to the Assistant Attorney General's requirements, such as were encountered in *Gehrig*, *Hoban*. However, the dates speak for themselves. In a future case, if the intent to request an investigation during litigation became known to me, and I expected the report to be offered under section 2633, I would ask to see the instructions to be sent the agent.

Obviously, too, a report by an agent of an interview with a witness would stand on a different footing if taken down in question and answer form, if signed by the witness, or if sworn to (it would be admissible as an affidavit then). I make no other comment as to these possible situations. Then too, an investigating agent might himself swear to his whole report, making an affidavit out of it. I make no comment as to that. If I had before me an affidavit tendered by a party-plaintiff, a report by an agent that the affiant refused to be interviewed, refused to have his statement taken down, refused to sign it, or refused to swear to it, of course would be for consideration in weighing the original affidavit.

Turning now to the facts at issue, the key determination the court must make is whether Nathan Rattan is a *bona fide* buying agent as claimed. If it is, its commission is not a part of dutiable value. If it is not, the claim that the purchases were ex-factory fails and other alleged nondutiable charges may be determined to be dutiable.

A buying commission is not a nondutiable element of the price unless it is *bona fide*. *United States* v. *Bauer et al.*, 3 Ct. Cust. Appls. 343, T.D. 32627; *United States* v. *Nelson Bead Co.*, 42 CCPA 175, 183, C.A.D. 590. The *bona fides* of a commission may well be questioned when the so-called commissionaire and the manufacturer are under common control of members of the same family. Cf. decisions under the Renegotiation Act (of 1943), section 403(c) (6), 50 U.S.C.A., appendix, section 1191(c) (6), holding that common control exists where separate legal entities are in fact controlled by the same person or members of the same family. *Lowell Wool By-Products Co.* v. *War Contracts Price Adjustment Board*, 192 F. 2d 405; *Thomas Warner, Jr., and Jean Sprague, etc.* v. *War Contracts Price Adjustment Board*, 14 T.C. 1320; *P. R. Hoffman and Bertha S. Hoffman, etc.* v. *The United States*, 23 T.C. 569.

The commissionaire's services must be rendered to the buyer and no part of the commission may inure to the manufacturer. *United States* v. *Nelson Bead Co., supra.*

Exhibit 1 purports to state the obligations of the agent here. Clearly, if genuine, it creates a relationship of trust and confidence. Normally the agent would owe a duty to allow no conflict of interest to exist unless the principal knowingly waived it. Here, the registration certificates show that Nathan Rattan and Kwong Tai Cheong, both partnerships, unincorporated, had no less than five partners common to both. Three of them were reported admitted to Nathan Rattan on November 23, 1962. But, if we suppose they had no interest before it was officially acknowledged, that does not help plaintiff because only two persons appear as having an interest in Nathan Rattan on July 1, 1961, and both of them were partners of Kwong Tai Cheong. For some unexplained reason, each company signed the certificate on behalf of the other. Mr. Missirlian admitted, too, that the managers of the two companies "might be" brothers. The Hammar report stresses the completeness of common control as it was in 1955, and later events of official record only reflect a further tightening: no outsider came in. It is impossible for the court to believe that any person employed by Nathan Rattan would "visit" any manufacturer other than Kwong Tai Cheong and "provide reports" with a view to enabling Fine Arts Bag to choose between Kwong Tai Cheong and any other would-be vendor on the basis of quality and price, as to any product that Kwong Tai Cheong offered. But, if this was impossible to expect, as I believe it was, the so-called "Agreement" does not reflect the real relationship between the parties and the buying agency is a myth. It is clear that part of any commission earned would "inure" to partners of Kwong Tai Cheong. It is also significant that when Mr. Missirlian first visited Nathan Rattan it was selling, not buying, merchandise such as that before the court. The official certificate already mentioned states that the "description and nature of business" of Nathan Rattan is "Manufacturers and Exporters of Rattan Furniture and Rattan Basketware products." The merchandise before the court is a rattan basketware product, or something very similar. There is no mention in the certificate of Nathan Rattan doing any business as a "buying agent," although notations on it indicate it was corrected up to a date subsequent to the alleged effective date of the "Agreement," exhibit 1, July 1, 1961. The "Agreement," according to Mr. Missirlian, was made within a month before or after July 1, 1961; the latest notation on the certificate shows admission of new partners on November 23, 1962.

The Hammar report, made in 1955, long before the entries at bar, indicates that at that time Nathan Rattan was the manufacturer and

Kwong Tai Cheong was the one in the selling end. Later they apparently interchanged their roles. The 1955 relationship is not, perhaps, controlling, except that this facile interchange would indicate that the legal separateness of the two firms was not very significant in the minds of those who dealt with them.

The following passage occurred on re-cross-examination (p. 36):

Q. Mr. Witness, would you again tell me why you are so sure that Nathan Rattan Furniture Co. and Kwong Tai Cheong are different companies?—A. Because I asked them, because they being brothers, I was a little suspicious it might be the same company.

Q. You didn't know they were brothers until I called it to your attention.—A. I was suspicious about it. I said it may be they are brothers, because I can't tell definitely. I asked them. They said they register separately, they are different companies, and they act differently.

The word "suspicious" tells a great deal, for it betrays the natural hesitation of a businessman to select as his "buying agent" a company closely related to his vendor. He used it twice. Yet the facts he says resolved his suspicion would utterly fail to do so if the buying agency were genuine. Clearly being separate companies and registering separately would not really answer the conflict of interest question if it really preyed on his mind. The court does not conclude that the conflict of interest was waived, but rather that the buying agency was not genuine. The legal separateness of the two Hong Kong companies was enough for plaintiff because the intended buying agency was for the benefit of United States Customs, not for real.

Exhibit "D" to the Spanos report which reflects that, if United States Customs does not accept Nathan Rattan as a buying agent, Nathan Rattan "must pay to Fine Arts Bag Co., one and half per cent," makes Nathan Rattan, and through it, Kwong Tai Cheong, interested parties in this litigation, and hence the two affidavits of officers of these companies, exhibits 4 and 5, are not from impartial sources.

Exhibit "E" to the Spanos report is the letter from plaintiff which reminds Nathan Rattan how to invoice consistent with the agreed theory that Fine Arts Bag was purchasing ex-factory. It recites that the parties "decided first on F.O.B. prices" and says "of course, according to this, the total amount of all your invoices should amount to this F.O.B. price total." It is, therefore, clear this merchandise was originally offered and accepted f.o.b., and the alleged change to ex-factory was agreed upon later, but involved no change in the total cost to the buyer. The alleged ex-factory price was to be constructed backward. If, as claimed, this merchandise was "freely offered" ex-factory, we need some explanation why the original agreement was not on that basis. Also, if the vendor and commissionaire were really

independent, the latter serving the buyer only, we are left with no explanation why the vendor reduced its selling price by 10 percent.

The affidavits, exhibits 4 and 5, set forth plaintiff's theory of the legal relationship of the parties. There is not much that is significant in them. Gilman Tsang's affidavit, exhibit 5, for Kwong Tai Cheong says "we offer and sell our merchandise on an ex-factory basis since this is the most practical and convenient method of sale." Why, then, did they originally offer to sell to Fine Arts f.o.b.? Each affiant claims his company is independent of all others, but not in such terms as to be inconsistent with the interlocking ownership and control reflected by the registration certificates.

Thus, in my view, there would have been sufficient evidence for a finding that the buying agency was not "*bona fide*," had Mr. Spanos' two recent oral interviews not been in the case.

Undoubtedly the parties intended to create the relationship of principal and buying agent for United States Customs purposes. But unfortunately, they did not intend to bring about the other normal incidents of such a relationship. They could not reasonably expect that Nathan Rattan would owe and would furnish its undivided loyalty to Fine Arts Bag in whatever dealings it had with respect to merchandise that Kwong Tai Cheong could supply. Nor could they expect that the commissions would not inure to the benefit of Kwong Tai Cheong, in whole or in part. Parties control the legal relationship between them by what their arrangements really are, not by what they call them. Cf. *Paul Morris* v. *United States*, 57 Cust. Ct. 585, R.D. 11207, where the so-called agent supplied materials for fabrication and retained the fruits of the bargain, without the knowledge or consent of the importer. It was held that the agency was not *bona fide* and the commissions were not deductible even though the principal may have intended to hire the other as an agent. The court quotes the Restatement of the Law of Agency to the effect that the agent is a fiduciary; he must act "primarily" for the principal; he must not act as, or on account of, the adverse party without the principal's consent.

It is evident that if the contract, exhibit 1, did not purport to create a relationship of trust and confidence, the plaintiff's difficulties of proof would not be so great. It is not unknown in customs law for parties closely related to sellers to be deemed working for buyers, and for their compensation to be, therefore, excluded from dutiable value. *Kurt Orban Company, Inc.* v. *United States*, 52 CCPA 20, C.A.D. 851; *Tapetes Luxor, S.A.* v. *United States*, 56 Cust. Ct. 797, A.R.D. 206 (appeal pending). But in those cases the services were more or less ministerial and did not involve a relation of trust and confidence. If the agent works for the seller also, it may be—I do not now so hold—there can, nevertheless, be a *bona fide* buying agency, but the proof of

its existence, to overturn an appraiser's determination, ought to be circumstantial and cover all details. Specifically, it ought to appear that the principal consented to the conflict of interest. Here, plaintiff rather tried to make it appear—most unconvincingly—that he was unaware the conflict existed. If the principal had stated he was aware of the conflict and consented to its existence, the court would confront a different issue which is not prejudged here.

Since the court cannot find that the buying agency was *bona fide*, as it understands the meaning of the term, an element is missing from the findings that would be necessary if the court were to overturn the appraised value. Plaintiff does not seriously base its claim on any possibility that "such" merchandise was sold or offered ex-factory to anyone other than plaintiff. Plaintiff did not buy ex-factory and, hence, the basis of its claim as to inland freight charges, etc., fails likewise. This view of the case makes it unnecessary to determine whether the appraisement was severable as plaintiff contends and the Government does not dispute.

The appraised values are sustained.

I find as facts:

1. That the imported merchandise consists of handbags or baskets of reed or rattan, coated with polyvinyl chloride, exported from Hong Kong in 1961 and 1962.

2. That the merchandise was entered at the invoice unit values, exclusive of inland charges and a so-called buying commission itemized on said invoices.

3. That the merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at the invoice unit values, plus the items marked "X," that is, a so-called buying commission and charges for inland freight, insurance, storage, haulage, and lighterage.

4. That the commissionaire and the manufacturer (both partnerships) were under common control of members of the same family; that part of any commission earned would inure to the partners owning the manufacturer; that the Business Registration Certificate described the business of the commissionaire as a manufacturer and exporter of rattan furniture and basketware products and not as a buying agent; that the commissionaire did not owe undivided loyalty to the buyer; that the buyer did not knowingly consent to the existence of a divided loyalty on the part of his alleged buying agent; that the merchandise was originally offered at an f.o.b. price, but later the invoices were directed to be made by figuring first an ex-factory price and adding the commission and other charges, but no change in the total cost to the buyer was involved.

5. That the evidence fails to establish the existence of the relationship of buying agent and principal between Nathan Rattan and Fine Arts Bag Co.

6. That on or about the dates of exportation, such or similar merchandise was not freely sold, or in the absence of sales, freely offered for sale in the principal markets of Hong Kong, in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States, at the entered ex-factory prices.

I conclude as matters of law:

1. That the so-called commission is not a *bona fide* buying commission.

2. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the values of the involved merchandise.

3. That said values are the appraised values.

Judgment will be rendered accordingly.