BUSHNELL INTERNATIONAL, INC.,
Appellant,

v.

The UNITED STATES, Appellee.

A.R.D. 297; Reappraisements R68/5857–
R68/5859.

United States Customs Court,
Second Division, Appellate Term.

Sept. 16, 1971.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak, Los Angeles, Cal., of counsel), for appellant.

L. Patrick Gray, III, Asst. Atty. Gen., John A. Gussow, trial atty., for appellee.

Before RAO, FORD and NEWMAN, Judges.

RAO, Chief Judge:

This is an application for review of a decision and judgment of Watson, J., holding, so far as here concerned, that the appraised values constituted the proper dutiable values of certain binoculars and cases and optical goods manufactured by Toyo Jitsugyo KK and exported from Japan during the period from July to September 1964. Bushnell International, Inc. v. United States, 64 Cust.Ct. 765, R.D. 11714, 314 F.Supp. 48 (1970). (Other merchandise covered by the de-

cision of the trial court is not involved in this application).

The parties are in agreement that export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement, the issue being whether such value is represented by the ex-factory unit prices, as claimed by appellant, or by the appraised values, which include inland freight and other charges, inspection fee and buying commission, as claimed by appellee.

Since the appraisements were at invoice unit values plus the charges marked "X" (including commissions and inspection fees), it was held that they were separable and that the issue was confined to the question of whether the merchandise was freely sold, or offered for sale, at the ex-factory unit prices without the said charges.

The trial court found that the merchandise sold by Toyo Jitsugyo KK was purchased at a price which included inland freight and other charges as well as inspection fees and so-called buying commissions, and that Oriental Trading Company, Ltd., appellant's alleged buying agent, was not a *bona fide* buying agent insofar as purchases from Toyo Jitsugyo KK were concerned. It therefore held that export value was represented by the appraised values as to that merchandise.

Appellant claims error in these findings and holding.

The issue presented is whether appellant has sustained its burden of proving that the relationship between it and Oriental Trading Company, Ltd., was that of principal and agent rather than that of buyer and seller and that the merchandise was freely sold, or offered for sale, to all purchasers at the claimed ex-factory prices.

The record consists of the testimony of David P. Bushnell, president of Bushnell International, Inc., the importer herein, and a number of documentary exhibits. From the evidence, it appears that Bushnell has been importing optical goods from Japan since 1948 and that in 1950 Oriental Trading Company, Ltd., was appointed its buying agent. A written agreement was entered into in 1955, according to which Oriental Trading was "to handle all the details concerning purchase of merchandise from factories on ex-factory basis, inspection at the Laboratory, export packing, storage, transportation to the port of shipment and shipping documentation" for which it was to receive a 5 percent commission on the ex-factory value of the merchandise (exhibit 1, attachment HY–1).

The Japanese name of Oriental Trading Company, Ltd., is Toyo Jitsugyo KK. The firm was formed in 1947 to serve as a buying agent. In 1956 it set up a factory branch at Kugahara, Japan. The Kugahara factory is registered as a manufacturer of binoculars and is referred to by the Japanese name of Toyo Jitsugyo KK. Oriental Trading Company, Ltd., is registered as an exporter and has retained its English name. However, Toyo Jitsugyo KK and Oriental Trading Company, Ltd., are not two separate companies; Oriental Trading is merely the export division of Toyo Jitsugyo KK.

Mr. Bushnell testified that he first became acquainted with the Toyo Jitsugyo Kugahara factory in 1956 when he was taken there on a visit to Japan. He understood that there were some common stockholders in Toyo Jitsugyo and Oriental Trading, but that in order to build a factory, additional capital was needed and other stockholders were brought in. He did not ask anyone about the specific relationship as he was interested only in getting good quality binoculars at a reasonable price. He did not learn that the Kugahara factory and Oriental Trading were related until 1966. In fact, in 1960, the working relationship between Bushnell and Oriental Trading was confirmed by a written agreement, which stated, among other things:

> As our purchasing agent, you are to handle all of the details concerning the purchase of the merchandise we designate from the various factories that you deem most appropriate under the circumstances. Purchases are

to be made on a freely offered ex-factory basis. You are to inspect every item to assure yourselves that each meets our high standards of quality. You are to supervise the export packing, arrange for outside storage and subsequent transportation to the port of export. You will pay all charges between the factory and the port of exportation. You are to prepare all export documentation.

All of your expenses, plus two percent (2%) for inspection fee and your five percent (5%) buying commission, are to be shown separately from the maker's ex-factory prices for the merchandise. Your charges and the maker's charges are to be shown on your invoices to us and collection made under our Letter of Credit established in your favor.

Mr. Bushnell negotiated with the Kugahara factory in the same manner as he dealt with other manufacturers at ex-factory prices. Sometimes a representative of Oriental Trading was present and sometimes not. Oriental Trading performed the same functions of inspection and shipment with respect to the merchandise manufactured by the Kugahara factory as it did with respect to merchandise manufactured by others.

An affidavit of Hideo Machiyama, chief of the Toyo Jitsugyo Kugahara factory (exhibit 2), states:

That Kugahara Factory set the sales price of its merchandise based upon its own determination of costs. That approximately 60% of the production of Kugahara Factory was sold for export to the United States to Bushnell International and was delivered through Oriental Trading Co., Ltd. That Kugahara Factory was not set up to export its merchandise, and purchasers in the United States or in other countries required the services of some export agent to arrange for exportation of his merchandise. That in 1964 and before, the merchandise manufactured by Kugahara Factory was freely offered at the same ex-factory prices for like quantities with similar terms

to United States importers through other buying agents. That offers at ex-factory prices such as those attached and marked Exhibit M–4 were also made directly by Kugahara Factory to purchasers from other countries who had export agents in Japan.
\* \* \*

Attached to the affidavit is a quotation given to Kuni Tsusho Co., Ltd., in May, 1964, setting forth unit prices for several types of binoculars and a bill to the same firm. According to an affidavit of K. Endo, president, Kuni Tsusho Co., Ltd., serves as a buying agent for American importers, had received ex-factory offers from Toyo Jitsugyo KK in June, 1964, and had made one purchase, for exportation to West Germany. (Exhibit 4)

■ ■ Commissions paid to agents for services rendered in procuring merchandise, inspecting and packing goods, arranging shipment, and making payments for the account of the buyer, *no part of which inure to the benefit of the seller*, are buying commissions and are not part of dutiable value, provided the agency is *bona fide*. United States v. Nelson Bead Co., 42 CCPA 175, 183, C.A.D. 590 (1955); United States v. Randbur Co., 48 Cust.Ct. 721, A.R.D. 146 (1962); Lollytogs, Ltd. v. United States, 55 Cust.Ct. 608, Reap.Dec. 11073 (1965); Reliance International Corp. v. United States, 62 Cust.Ct. 845, R.D. 11639, 305 F.Supp. 20 (1969); Carolina Mfg. Co. v. United States, 62 Cust.Ct. 850, R.D. 11640 (1969); Chadwick-Miller Importers, Inc., et al. v. United States, 66 Cust. Ct., R.D. 11743 (1971). However, where the relationship between the parties is that of buyer and seller rather than principal and agent, an item claimed to be a "buying commission" is not deductible. B & W Wholesale Co., Inc. v. United States, 436 F.2d 1399, 58 CCPA 92, C.A.D. 1010 (1971); Morris Friedman v. United States, 52 Cust.Ct. 660, A.R.D. 178 (1964); Pan Pacific Importers, Ltd. v. United States, 10 Cust.Ct. 530, Reap. Dec. 5804 (1943); Samuel S. Perry v. United States, 24 Cust.Ct. 546, Reap.Dec.

7794 (1950); Fine Arts Bag Co. v. United States, 57 Cust.Ct. 625, R.D. 11224 (1966). Profit, as distinguished from a purchasing commission, is an essential element of export value. United States v. S. S. Kresge Co., et al., 26 CCPA 349, C.A.D. 39 (1939).

Where the commissionaire and the manufacturer (both partnerships) were under common control of members of the same family and part of any commission would inure to the partners of the manufacturer, it was held that the buying agency was not *bona fide*, and the so-called commission was properly a part of dutiable value. Fine Arts Bag Co. v. United States, *supra*. See also Paul Morris v. United States, 57 Cust.Ct. 585, R.D. 11207 (1966), application for review dismissed 58 Cust.Ct. 821, A.R.D. 221 (1967), holding that the agency was not *bona fide*, where at times the commissionaire supplied the basic materials for fabrication and the ex-factory price went to it, and where, after making payment for fabrication costs, it retained the profit or suffered the loss.

In Park Avenue Imports v. United States, 62 Cust.Ct. 1035, A.R.D. 255, 299 F.Supp. 528 (1969), the court held that common control of the *importer* and the commissionaire did not preclude a finding of a *bona fide* buying agent relationship, but that if the commissionaire was in fact a seller or an agent of the seller, the commission would not be a *bona fide* buying commission. It held that the mere showing of the agent's stock interest in the manufacturer was of no significance since there was nothing to indicate any privity between the two or that any of the commissions inured to the benefit of the sellers.

In the instant case, since the alleged buying agent (Oriental Trading Co., Ltd.) was the export division of the seller (Toyo Jitsugyo KK) there is no doubt that there was privity between them and that the commissions inured to the benefit of the seller, even though the factory division and the export division kept separate financial records and did not control each other's activities.

In B & W Wholesale Co., Inc. v. United States, *supra*, it appeared that the importer placed orders with M. Matsumoto & Co., Ltd., in Japan, which allocated corresponding orders to factories in Japan. The importer had no control over the choice of factories, did not receive substantiation of the inland freight charges and did not control the mode by which the goods were shipped. It did not take possession of the goods until they were on board ship in Kobe. The court held on these facts that an agency relationship did not exist between Matsumoto and the importer and that there was no basis for a "commission."

In the instant case the agreement of March 13, 1960 between Bushnell and Oriental Trading states that Oriental Trading is to handle purchasing details of merchandise "from the various factories * * * *you* deem * * * appropriate under the circumstances." [Emphasis added.] This leaves the selection of the manufacturers to Oriental Trading. In view of this and the fact that Oriental Trading is a division of Toyo Jitsugyo KK, it is difficult to believe that Oriental Trading would find appropriate any manufacturer other than Toyo Jitsugyo as to any product it offered. Cf. Fine Arts Bag Co. v. United States, *supra*, 57 Cust.Ct. p. 634.

While in the *Fine Arts* case, the court indicated that it might be that an agent who worked for a seller could be a *bona fide* buying agent of another, it stated that it would have to appear that the principal consented to the conflict of interest. In the case before us, the importer may have known that there was some common ownership of Oriental Trading and Toyo Jitsugyo, but it was not aware that the two were in fact a single company, and did not consent to the participation of Oriental Trading under the circumstances. Although Toyo Jitsugyo through Oriental Trading might properly serve as a buying agent of Bushnell in dealing with other sellers, it could not do so in regard to its own merchandise, where it was in effect dealing with itself, unless Bushnell had con-

sented. Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party nor to act on behalf of an adverse party in a transaction connected with his agency. Restatement of the Law of Agency, Second, sections 13, 389, 391. The authority to act as an agent ordinarily includes only authority to act for the benefit of the principal. *Ibid.*, section 39. Moreover:

Where * * * the agent is carrying out the purposes of the general employer, the fact that the agreement between the agent and an alleged second employer specifies that he is to be the agent of the second employer, does not necessarily have that effect. If it is found that he is the agent of one for the transaction or a part of it, the normal rights and liabilities of a principal accrue to that one. [*Ibid.*, section 14 L.]

Accordingly, we find that as to the merchandise purchased from Toyo Jitsugyo, no agency relationship existed between Bushnell and Oriental Trading and there was no basis for "commissions" or "inspection fees."

Appellant relies upon Kurt Orban Company, Inc. v. United States, 52 CCPA 20, C.A.D. 851 (1965) and United States v. Tapetes Luxor S. A. et al., 54 CCPA 116, C.A.D. 921 (1967). In the *Kurt Orban* case, an organization known as SAPET was an exclusive export sales agent for six wire manufacturers and a nonexclusive agent for at least four others. It received orders from the purchasers and placed them with the particular mill designated by the buyer. The mill prices were ex-factory but it was customary for SAPET to arrange transportation from factory to ship and the charges were added to the invoiced amount. However, purchasers could take delivery at the factory and arrange for transportation themselves. It was therefore held that the ex-factory price represented the export value.

In *Tapetes Luxor*, merchandise was usually sold at f. o. b. Laredo prices, but it could be purchased f. o. b. Texcoco, the place of manufacture. When it was bought f. o. b. Laredo, Export Shipping Company, a subsidiary of the manufacturer, arranged transportation, paid duty and incidental expenses, and charged a 5 percent commission for its services. The court held that since the merchandise was available f. o. b. Texcoco and since purchasers could take delivery at the factory and arrange their own transportation, the commission was not a part of export value.

In both of these cases, the commissionaire was not the same legal entity as the seller. The deciding factor was not the relationship of the parties but the fact that it was clearly established that the merchandise was freely sold, or offered for sale, at ex-factory prices and could have been obtained without the services of the commissionaire.

That factor has not been established in the instant case.

Appellant claims that it has shown that the merchandise was freely sold or offered ex-factory by proof of a "climate of sales" by many different makers of a variety of merchandise at ex-factory prices.

The term "climate of sales" has been used by the courts in Hub Floral Manufacturing Company v. United States, 62 Cust.Ct. 979, 985, A.R.D. 249, 296 F. Supp. 355 (1969), aff'd United States v. Pan American Import Corp. et al., 428 F.2d 848, 57 CCPA 134, 139, C.A.D. 993 (1970), and in Karl Schroff & Associates, Inc., et al. v. United States, 66 Cust.Ct., A.R.D. 286 (1971).

In *Hub Floral*, it appeared that a great variety of merchandise was purchased over a period of 3 years from many different manufacturers through three buying agents always at ex-factory prices. The buying agents stated that they also acted for other American importers, for whom they purchased from the same manufacturers on an ex-factory basis. On the record presented, it was held a reasonable inference that the importer was not the only purchaser able to buy

at ex-factory prices or that any special accommodation was made to it.

In the *Schroff* case there was evidence that the importer had negotiated with nine different manufacturers on an ex-factory or ex-warehouse basis; that the method of doing business was utilized by various other American purchasers, and that manufacturers other than the nine mentioned, sold on the same basis.

In support of the alleged "climate of sales" in the instant case, there is a stipulation made at the trial that the freely offered price of merchandise described as "Eagle 100 pcs. of 'Bushnell' 7 x 18 MCF", manufactured by Meiji Seiko KK was its ex-factory unit price. It was also held by the trial judge that merchandise manufactured by Ohta Optical Co. was freely offered to all purchasers at ex-factory unit prices. The court found that, as to the sales by Ohta Optical Co. and Meiji Seiko KK, Oriental Trading was a genuine buying agent.

According to the affidavit of Mr. Machiyama, 60 percent of the production of the Kugahara factory was sold to Bushnell and was delivered through Oriental Trading. He also stated that merchandise manufactured by the factory was offered at ex-factory prices to United States importers through other buying agents and to purchasers from other countries who had export agents in Japan. In support of these statements, reference is made to one sale in 1964 to Kuni Tsusho Co., Ltd., which apparently was for exportation to West Germany and not the United States.

Appellant has also offered in evidence copies of pages from the Toyo Jitsugyo KK Daily Contract Book (exhibit 3A). These show contracting parties other than Bushnell, apparently Japanese firms, and list the "condition of delivery" as "ex-factory" or "branch" or "buying office" and give the unit price in dollars as to Bushnell and in yen to others. The Kugahara branch itself is listed as a contracting party in many cases. Kuni Tsusho to whom a sale was mentioned in Machiyama's affidavit is not listed.

In exhibit A, Customs Representative Powell states that Mr. Segawa [of Oriental Trading] had informed him that "in addition to sales exported under the name of Oriental Trading, Toyo Jitsugyo manufactured merchandise it sold to Japanese trading companies for eventual export to the United States" and that the ex-factory prices shown on invoices represent the amounts Toyo Jitsugyo would have received if the merchandise had been sold to a Japanese exporting company, other than Oriental Trading.

In our view the evidence presented does not establish that Toyo Jitsugyo freely sold or offered its merchandise to all purchasers on an ex-factory basis or that it offered the option of purchasing either ex-factory without the participation of Oriental Trading or on some other basis. Therefore, the ex-factory prices do not represent dutiable export value.

For the reasons stated, the so-called commissions and inspection fees and the inland freight and other charges added by the appraiser are held properly part of the export value of the merchandise involved herein.

On the record presented, we find as facts:

1. That the merchandise involved herein consists of binoculars and cases, and other optical goods, manufactured by Toyo Jitsugyo KK, and exported from Japan during the period from July through September, 1964.

2. That the merchandise does not appear on the Final List promulgated by the Secretary of the Treasury pursuant to the Customs Simplification Act of 1956, 93 Treas.Dec. 14, T.D. 54521.

3. That the merchandise was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at the invoiced unit values plus items mark-

ed "X", which included inland charges, buying commissions and inspection fees.

4. That Oriental Trading Company, Ltd., purportedly the buying agent of Bushnell International, Inc., the importer, in connection with the purchase of this merchandise, is the export division of Toyo Jitsugyo KK, the manufacturer and seller.

5. That Bushnell International, Inc., did not know of the relationship between Oriental Trading Company, Ltd., and Toyo Jitsugyo KK at the period involved herein and did not agree to the participation of Oriental Trading Company, Ltd., as buying agent under the circumstances.

6. That the merchandise purchased from Toyo Jitsugyo KK was purchased at a price which included inland freight and other charges as well as inspection fees and so-called buying commissions.

7. That the evidence did not establish that Toyo Jitsugyo KK sold or offered its merchandise to all purchasers on an ex-factory basis or that it offered the option of purchasing either ex-factory without the participation of Oriental Trading Company, Ltd., or on some other basis.

We conclude as matters of law:

1. That no agency relationship existed between Bushnell International, Inc., and Oriental Trading Company, Ltd., and that there was no basis for "commissions" or "inspection fees."

2. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the appraisement of the merchandise involved herein.

3. That said value is represented by the appraised values.

The decision and judgment of the trial court is affirmed and judgment will be entered accordingly.

FORD and NEWMAN, JJ., concur.