(Reap. Dec. 9165)

AUGUSTA CHEMICAL CO. v. UNITED STATES

Entry No. 865439.

(Decided June 5, 1958)

*Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.
*Barnes, Richardson & Colburn* (*James F. Donnelly*, *E. Thomas Honey*, and *Eugene L. Girden* of counsel) as *amicus curiae*.

WILSON, Judge: This appeal challenges the appraised value placed upon 400 pounds of a product, invoiced as "1-Chlor-2.4-dimethoxy-5-aminobenzene," exported from Holland on March 11, 1955, and entered at the port of New York on March 23, 1955. The appraised value was $6 per pound, 100 per centum basis, packed. The importer claims a value of $3.50 per pound, on the American-selling-price basis.

It is conceded that the correct basis of appraisement is the American selling price, as provided in section 402 (g) of the Tariff Act of 1930, as amended, reading as follows:

(g) AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

The plaintiff called as its only witness Henry I. Gilbert, president of the importing company, which manufactures, buys, and sells dyestuffs and chemicals. Mr. Gilbert stated he is a trained chemist and is familiar with the manufacturing processes employed by his company and also with the buying and selling of chemicals, including coal-tar products, and that, prior to his connection with the plaintiff company, he had been familiar with coal-tar products for a period dating back to the 1930's. He further testified in substance as follows: The Augusta Chemical Co., over a period of years, has bought materials from E. I. du Pont and the Morse Co., and has dealt with the General Dyestuff Division of General Aniline, as well as with other companies dealing in similar products. At no time during the period that Mr. Gilbert has been associated with the plaintiff company has any sales agent or agents representing American manufacturers and sellers of chemical products, including coal-tar materials, offered to sell to the Augusta Chemical Co. any such product as that now before the court, and no company representative calling at the plaintiff's place of business has ever quoted a price on any such product. Mr. Gilbert, who stated he was familiar with the general market prices prevailing for coal-tar products during the first half of 1955, testified that, during such period, prices did not fluctuate. In response to questions propounded by the court, the witness testified as follows:

JUDGE WILSON: Did that apply to all of them including this one?

THE WITNESS: At this particular time I couldn't say no, no intermediates had changed price, but in a general fashion they were fairly stable. That's about all I can say competently.

JUDGE WILSON: You are speaking of all the intermediates including the one in which we are specifically interested?

THE WITNESS: That's right. I can't know specifically of all the hundreds and hundreds that are made and sold. (R. 63–64.)

However, he could give no specific answers concerning values and sales relating to the material in question, and could not, even after refreshing his recollection from a notebook, tell any specific instances where he had asked for a quotation from a salesman covering a product such as the one now before us.

Plaintiff offered certain letters covering inquiries made by the company to certain manufacturers of chemicals in 1955, and replies thereto (plaintiff's exhibits 3–10, inclusive). It is clear that these letters are entitled to very little weight as evidence, since they relate to a time subsequent to the date of exportation (March 11, 1955). However, the exhibits were admitted. In effect, these exhibits may be summarized as follows:

Plaintiff's exhibit 3, a letter dated May 27, 1955, directed to General Aniline & Film Corp., New York, N. Y., reads:

We would appreciate your notifying us whether or not you offer
1-Chlor-2.4-Dimethoxy-5-Aminobenzene
for sale.   If so, please quote price and delivery.

Plaintiff's exhibits 4 and 6, also dated May 27, 1955, and directed to E. I. du Pont de Nemours & Co., and American Cyanamid Co., respectively, are identical in form with plaintiff's exhibit 3.   The du Pont company (plaintiff's exhibit 5), National Aniline Division, Allied Chemical & Dye Corp. (plaintiff's exhibit 7), and Verona Chemical Co. (plaintiff's exhibit 9) replied that they were not manufacturing the involved product and were unable to quote prices.   Antara Chemicals (plaintiff's exhibit 8), under date of June 23, 1955, advised the plaintiff as follows:

From time to time we have sold this material for $6.00 per pound on 100% basis, M. W. 187.5, FOB our plant, with minimum transportation allowed. Unfortunately, we do not have the material in stock at the present time and in checking with our production people we find that there is none scheduled for the near future.   If you can give us a requirement that would allow us to introduce this material into our production schedule, we shall be happy to investigate the quantities involved and the time that we might be able to make shipment.   If the quantities you require are small, we could arrange to make an over-run of production when next material is scheduled for our own internal consumption.

\*       \*       \*       \*       \*       \*       \*

Obviously, that is not an offer to sell, and the letter contains no information of value to the court, unless it be that, when Antara Chemicals had sold the product, it sold it for $6 per pound on a 100 per centum basis, molecular weight 187.5, which price represents that used as the basis for the appraisal herein.   It should be pointed out also that plaintiff's exhibit 1, which is the United States chemist's report on the analysis made of a sample of the product here involved, contains the following:

The sample is a coal-tar product derived from one of the products provided for in Par. 26 or 1651 and titrates 86.6% pure using a molecular weight of 187.5.

It is comparable, on a 100% basis, with 5 chloro-2, 4-dimethoxyaniline made by Antara Chemicals (Div. of General Dyestuff Corp.).

The above appears to be the same material as that referred to in plaintiff's exhibit 8, heretofore referred to.   ·

The only reply received by the importer, which could be construed as an offer of sale of any sort, is plaintiff's exhibit 10, a letter, dated July 29, 1955, from the Hilton-Davis Chemical Co., in reply to a letter of inquiry from the importer, dated June 13, 1955.   Said exhibit reads as follows:

We have your letter inquiry of June 13th regarding 1-Chlor 2.4 Dimethoxy 5-Aminobenzene.   We can offer this material as 2,4 Dimethoxy 5-Chlor Aniline (Code 70–2390) at $3.50 per pound, delivered.

We have approximately 200 pounds of this product in stock at the present time and could make immediate delivery on this quantity, however if larger quantities are needed, please advise your requirements and we can then discuss the possibility of producing additional material.

It will be noted that the foregoing letter describes the material which the writer is offering as "2,4 Dimethoxy 5-Chlor Aniline (Code 70–2390)." The material before us was invoiced as "1-Chlor-2.4-dimethoxy-5-aminobenzene." However, in the chemist's report (plaintiff's exhibit 1), the merchandise in question is said to be comparable with "5 chloro-2, 4-dimethoxyaniline," made by Antara Chemicals, so it will be assumed that the material referred to in plaintiff's exhibit 10 is a product such as that here involved.

It is, of course, an elementary principle of customs law that an importer who challenges the appraised value of his goods must offer evidence sufficient to overcome the presumption of correctness which attaches to the appraisement as made and that he has the further burden of establishing what he considers to be the true basis for appraisement, or the true value of the goods involved for tariff purposes. He must meet every material issue in the case. *Brooks Paper Company* v. *United States*, 40 C. C. P. A. (Customs) 38, C. A. D. 495; *Kenneth Kittleson* v. *United States*, 40 C. C. P. A. (Customs) 85, C. A. D. 502. The plaintiff, in this case, has failed to discharge the burden imposed upon it under the statute.

The record shows clearly that the importer made no real effort to acquaint itself with the American selling price at any time prior to the date of exportation. Neither did the plaintiff attempt to determine in any manner the American selling price, until approximately 2½ months after the exportation of the goods from Holland. The alleged offer upon which the importer relies (plaintiff's exhibit 10) is dated July 29, 1955, about 4½ months after the exportation of the material before the court. Since all of the other replies received by the importer to inquiries addressed to American manufacturers between May 27, 1955, and June 13, 1955, may be excluded as having no evidential weight whatever in determining the issue before the court, it follows that the letter of July 29, 1955, is the only evidence as to American selling price before the court. Plaintiff's exhibit 10 is not supported by any evidence concerning the American selling price prior to the date of exportation. Nor is there anything in said exhibit that shows that even on the date thereof the imported product was "freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic

consumption in the ordinary course of trade and in the usual whole-sale quantities, at the time of exportation of the imported article" (section 402 (g), as amended).

It seems a fair conclusion that the 200 pounds of the material on hand, referred to in plaintiff's exhibit 10, was merely a surplus of some sort which the manufacturer was willing to sell, and the letter further indicates that any additional quantities desired by anybody would have to be produced and sold, if offered at all, upon terms to be discussed later.

In construing the words "at the time of exportation," as used in section 402 (d) of the act, relating to export value, the court, in *D. N. & E. Walter & Co. v. United States*, 42 C. C. P. A. (Customs) 114, 117, C. A. D. 582, stated:

* * * In applying the provision in section 402 (d), *supra*, i. e., that the export value of imported merchandise "shall be the market value or the price, at the time of exportation of such merchandise to the United States," the courts without qualification have held that such "time of exportation" is to be determined by the date of the actual exportation which finally results in the importation of the goods into the United States.

In the case of *United States v. Robert Reiner, Inc.*, 35 C. C. P. A. (Customs) 50, C. A. D. 370, at page 55, the appellate court, respecting United States value (section 402 (e), Tariff Act of 1930), stated:

* * * it has now become the settled rule that in construing the term "at the time of exportation," it should not be held that the exact date is required but only that, *prior to the exportation of the merchandise being valued, there had been at least one offer of sale* of imported prototype merchandise under conditions which would truly reflect the United States value of the merchandise under appraisal. [Emphasis added.]

There appears no reason for a different construction of the language "at the time of exportation," as used in section 402 (g) of the act, relating to American selling price, from the interpretation above enunciated. Hence, any evidence of offers of sales subsequent to the date of exportation of the involved merchandise could not be helpful in establishing the American selling price of the imported product.

In the case of *Hudson Shipping Co., Inc. v. United States*, 43 C. C. P. A. (Customs) 19, C. A. D. 604, the facts were somewhat similar to those involved in the instant case. As summarized by the appellate court, the record showed:

* * * The president of the importing firm testified that he was familiar with market conditions for phthalic anhydride; that there were five major producers of the product in the United States; that in October, November, and December, 1949, he communicated with four of these companies by letter and telephone relative to purchasing phthalic anhydride from them; that the fifth major producer was not producing phthalic anhydride during that period * * *; that none

of the producers contacted by him offered to sell importer any phthalic anhydride during October, November, or December, 1949; that due to a steel strike (which reduced the supply of naphthalene, the raw material from which phthalic anhydride is made), and the explosion at the factory of one of the major producers, he found domestically-produced phthalic anhydride in extremely short supply in the involved period.

In the *Hudson Shipping* case, *supra*, certain carbon copies of letters, in substantially the same form as those now before the court (plaintiff's exhibits 3, 4, and 6), were introduced in evidence, together with replies from manufacturers of the product therein involved. Considerable other evidence which need not be quoted here was summarized by the court. The goods were appraised upon the basis of the American selling price. The importer contended that certain market conditions for the domestic product made it impossible to find an American selling price which would meet the requirements of the statute (section 402 (g) of the Tariff Act of 1930, as amended).

Some of the principles announced by the court in the *Hudson Shipping* case, *supra*, are particularly applicable to the case now before the court, as is evidenced, page 26 therein, by the following quotations:

Thus, we hold that, in order to make out a *prima facie* case that there was no price at which phthalic anhydride was freely offered to all purchasers (under the conditions of this case) appellant had the burden of producing evidence tending to show that not one producer or owner of phthalic anhydride was freely offering the product to all purchasers at any price. It may be argued that this places a practically impossible burden upon the importer. The short answer is that he is trying to prove a practically impossible situation. One way the burden might be met is by offering evidence of a monopolistic control, but no such evidence has been introduced here. In an economy where the profit motive rules, where there is no monopolistic or Governmental price control, and where a substantial supply of a fungible is in the hands of those who can make such disposition of it as they may choose, the odds overwhelmingly favor the existence of some price at which the material is freely offered to all purchasers willing to pay that price. However, if there is evidence of monopoly or of price control or of discrimination, then the free market cannot be assumed. But where, as here, the evidence shows no tampering with the conditions for a free market, the only permissible assumption is that there is a free market price, i. e., a price at which the product is freely offered to all purchasers. Thus we hold that importer had the burden of introducing evidence tending to prove that *no* producer or owner of phthalic anhydride was freely offering it for sale at any price, *or* that there was some interference with economic conditions which prevented application of the law of supply and demand. Neither branch of this burden has been met in this case.

Furthermore, we may note that even the proof offered with regard to the situation of the five major producers is far from satisfactory. In no case were the books of the major producers offered in evidence, nor were representatives of such companies called to testify, nor was it established by any competent evidence that it was impossible to do so. Rather, letters and hearsay statements were received in an attempt to *indirectly prove the conditions then existing.* * * * [Italics quoted.]

On the record therein presented, our appellate court, in the *Hudson Shipping* case, *supra*, affirmed the action of the lower court and the trial judge in upholding the value returned by the appraiser.

In the instant case, the importer does not deny, but rather asserts, the existence of an American selling price but, as in the *Hudson Shipping* case, *supra*, the plaintiff herein made no effort to offer in evidence any of the books of the major producers, or to call in representatives of the American companies who undoubtedly were familiar with the American selling price. Further, as in the cited case, the plaintiff here chose to rely upon "letters and heresay statements," which fall far short of discharging the burden resting upon the importer. While it is true, as contended by the importer, that proof of offers may be sufficient to establish values, in the absence of sales (*United States* v. *A. J. Bracher Co., Inc., et al.*, 66 Treas. Dec. 1162, Reap. Dec. 3392; *United States* v. *American Agar & Chemical Co.*, 34 Cust. Ct. 553, A. R. D. 59), yet, there exists no such situation here.

The following quotations from the court's opinion in the *Kenneth Kittleson* case, *supra*, are particularly applicable to the situation now under consideration:

It was not incumbent upon the Government to prove that the appraised value was proper, until or unless the importer had shown said appraisement to be erroneous and established a different value in place thereof. There is not the remotest approach in this record by the appellant to that accomplishment and without such proof it was, as we have said, unnecessary for the Government to do that which this assignment of error indicated appellee had in mind in offering such proof. It is definitely fixed by the Tariff Act of 1930 and judicial interpretations of the provisions thereof that the burden upon a party attacking an appraised value is two-fold, and the validity of such action enjoys a presumption of correctness until such burden is met. *Harry Garbey* v. *United States*, 24 C. C. P. A. (Customs) 48, T. D. 48332; *United States* v. *Freedman & Slater, Inc.*, 25 C. C. P. A. (Customs) 112, 118; *Transatlantic Shipping Co., Inc.* (*Absorbo Beer Pad Co., Inc.*) v. *United States*, 28 C. C. P. A. (Customs) 19, C. A. D. 118; *Sears, Roebuck & Co., et al.* v. *United States*, 31 C. C. P. A. (Customs) 36, 42; *United States* v. *Robert Reiner, Inc.*, 35 C. C. P. A. (Customs) 50, 56. * * *

For the reasons hereinbefore stated, I find that the plaintiff, in this case, has failed to overcome the presumption of correctness attaching to the appraiser's finding of value and has also failed to present any evidence which would warrant the court in finding any other statutory value for the imported merchandise.

Accordingly, I find as facts:

(1) That the merchandise in this case consists of 400 pounds of a coal-tar product, invoiced as "1-Chlor-2.4-dimethoxy-5-aminobenzene," exported from Holland on March 11, 1955, and entered at the port of New York on March 23, 1955.

(2) That the involved merchandise is subject to appraisement on

the basis of American selling price, as that value is defined in section 402 (g) of the Tariff Act of 1930, as amended.

(3) That the merchandise was appraised on the basis of American selling price (section 402 (g) of the Tariff Act of 1930, as amended) at $6 per pound, packed, on the basis of 100 per centum (equal to $5.196 per pound at 86.8 per centum purity of the involved product).

(4) ·That the evidence submitted by the importer, in this case, is not sufficient to establish that the appraised value was erroneous or to establish some other correct statutory American selling price.

I conclude as matters of law:

1. That the value returned by the appraiser, which is presumptively correct, has not been overcome.

2. That the proper value for the merchandise here involved is the value found by the appraiser.

Judgment will issue accordingly.