(R.D. 11311)

B & W WHOLESALE Co., INC. *v.* UNITED STATES

Entry No. 3810–H.

(Decided May 23, 1967)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Carl Eardley*, Acting Assistant Attorney General (*Andrew P. Vance, James S. O'Kelly*, and *Morris Braverman*, trial attorneys), for the defendant.

FORD, Judge: The merchandise involved in this appeal for reappraisement is described on the entry as metal squares, rubber mallets, "artist brushes," and extra vinyl kits and bags. It was imported from Japan and entered at the port of Houston on October 4, 1961. According to the papers submitted on entry, the merchandise was made by three different makers in Japan: Enzeru Gahitsu Yugenkaisha, Towa Kogu Yugenkaisha, and Speed Kogu, K.K. M. Matsumoto & Co., Ltd., is named as the shipper and B & W Wholesale Supply Co., Inc., as the importer of record.

The merchandise was appraised at the invoice unit values, plus charges marked "X," that is, 5 percent buying commission, inland freight, storage, inland insurance, inspection charges, hauling and lighterage, and petties. Appraisement was on the basis of export value, as that value is. defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The basis of valuation is not disputed, but plaintiff claims that the proper dutiable export value is the invoice unit values, claimed to represent ex-factory prices, without the additions made by the appraiser for buying commission and other charges.

The principal witness at the trial was Robert L. Bernstein, treasurer of B & W Wholesale Supply Co., Inc. (hereinafter called B & W). In the course of his duties, he traveled to Japan to purchase merchandise for the company, making about two trips a year since 1958. In the spring of 1961, he visited the headquarters of the shipper of the merchandise involved, M. Matsumoto & Co., Ltd. (hereinafter

called the Matsumoto company), a trading company or broker or commission agent for the exportation of merchandise from Japan. As the result of the meeting, B & W and other related companies entered into an agreement, dated May 1, 1961, with the Matsumoto company. (Plaintiff's exhibit 1.) It provides that the Matsumoto company will visit manufacturers, collect and submit samples, provide regular reports pertaining to the market, and quote prices. Upon instructions from the companies, it was to place orders with manufacturers, inspect merchandise, and arrange shipment. It was to receive a buying commission at the rate of 5 percent on first cost, ex-factory Japan. The agreement further provides:

M. Matsumoto & Co., Ltd., will purchase merchandise on the basis of ex-factory price plus the additional charges totaling the final cost such as case and packing, inland freight to port of shipment, insurance to steamer, storage, hauling and lighterage, buying commission, etc.

In order to avoid misunderstandings of price quotations when communicating, it is hereby agreed that M. Matsumoto & Co., Ltd., will quote above named companies, the cost of the merchandise in United States Dollars. The price quotations and confirmation always show the price ex-factory at which the goods were purchased and the additional costs to get merchandise to port in Japan.

\*   \*   \*   \*   \*   \*   \*

The buying agent shall have no authority to bind above named companies, except upon receipt of written order or authorization of the said company.

An earlier agreement, dated October 3, 1959, between the Matsumoto company and B & W and related companies (defendant's exhibit A) contains about the same provisions, except the following paragraph:

In order to avoid misunderstandings of price quotations when communicating, it is hereby agreed that the M. Matsumoto & Co., Ltd., will quote the above named companies, the cost of the merchandise F.O.B. Japan port in United States Dollars. Such quotations shall always include the buying commission. However, the confirmation must always show the price ex-factory at which the goods were purchased and the F.O.B. Japan Port price.

The merchandise involved herein is covered by a purchase order, dated April 1, 1961. (Plaintiff's exhibit 4.) For each item of merchandise, the purchase order lists an amount for f.o.b. factory cost; buying commission; inland freight; warehouse, loading, bank and handling charges; a subtotal; and a total. Mr. Bernstein explained:

These amounts were given to us by the Matsumoto Co. in the process of buying. What we would do was to go to ask Mr. Matsumoto to negotiate with a maker on a given item on an ex-factory basis. He would then come back to give us the ex-factory prices. We would ask him

then for the additional prices as per the columns on our purchase orders. He would give us these figures and a composite would be added on any purchase order.

He said that the f.o.b. factory cost and the buying commission were the actual costs but that the other charges were estimated amounts. Payment of the total invoice amount was made by check remitted by B & W to the Matsumoto company.

Mr. Bernstein testified that, when he went to Japan, he visited trading companies, makers, and anyone who would offer merchandise. With regard to this merchandise, he went to see the Matsumoto company, not the manufacturer. Mr. Matsumoto had procured samples, and Mr. Bernstein gave him the purchase orders before he left Japan. He said he purchased the items from Mr. Matsumoto. The latter gave him orally the breakdown of figures which appears on the purchase order, which was typed thereafter.

Mr. Bernstein testified that there was nothing on the purchase order to indicate the name of the manufacturer, but that he was concerned about the identity of the manufacturer because some factories in Japan are not reliable. However, he said the Matsumoto company had the legal right to place orders with anyone it wanted. Mr. Bernstein said he had visited one of the factories which produced some of the items involved herein, Towa Kogu, but he did not know whether it was before or after placing the order.

The witness said he issued instructions to trading companies to make out the invoices exactly as the purchase orders and to show an ex-factory price at all times. He said B & W did not buy on an f.o.b. basis but insisted that prices be on an ex-factory basis. However, B & W did not receive bills for inland freight, and the witness had no idea whether it was paying the actual amount charged. Even when he thought the charges excessive, he did not require the agent or trading house to substantiate them. He took their estimate. The goods were delivered by the manufacturer to Kobe, but the witness did not know how they got there. That was one of the things left to the Matsumoto company. He did not know who owned the warehouse in Kobe where the goods were delivered and did not know whether there had ever been any pilferage or loss at the warehouse. He said:

According to my best belief, we don't take possession of the merchandise until it gets into a warehouse in Kobe. I don't believe we take possession until it gets on board ship.

Mr. Bernstein testified that, prior to June or July of 1961, B & W had a resident agent in Japan, Mr. Paul R. Brown, whose duties were to secure quotations and make sure merchandise was delivered in accordance with the terms of purchase orders. He received a commission on gross shipments, but the witness did not know how he was paid.

He was replaced in July 1961 by Globemaster, Inc., or Globemaster, Japan, which firm was established by Mr. Bernstein. Mr. Terramoto was placed in charge and had the same duties Mr. Brown formerly had. Although the Matsumoto company inspected the merchandise, the final inspection was by Globemaster.

Plaintiff introduced into evidence an affidavit of Masami Matsumoto, sworn to on June 9, 1964. Mr. Matsumoto states therein that he is the owner and principal stockholder of M. Matsumoto & Co., Ltd., which serves as buying agent for foreign customers desiring to purchase tools and other articles from Japanese sources. It has acted as buying agent of B & W and related companies, rendering services such as visiting manufacturers, collecting and submitting samples with price quotations, placing orders with the maker, inspecting merchandise and arranging shipment "for all of which M. Matsumoto & Co., Ltd., received full FOB amount including buying commissions." The affidavit continues:

M. Matsumoto & Co., Ltd. places all orders on behalf of B & W Wholesale Supply Co. and its affiliates on the basis of ex-factory prices plus the inland freight to warehouse. (This is called ex-godown). All invoices to B & W Wholesale Supply Co. are made out on the basis of ex-factory prices stated in Purchase Order, and the invoices list all charges such as buying commission, shipping charges (estimated) and any other charges (all estimated) which will be incurred after the goods are packed ready for shipment from the factory, and this has always been the case with all shipments from M. Matsumoto & Co., Ltd. to B & W Wholesale Supply Co. or B & W Southwest Corporation.

The affidavit then states that, on or about April 1, 1961, the Matsumoto company ordered the goods involved herein from the makers at certain prices which were listed and which were ex-godown per dozen, that is, the price for the merchandise as it came to the warehouse packed for shipment to the United States. The affidavit adds:

At the time of exportation of the goods listed above the principal market for the sale of the goods was and all times has been at the respective factories manufacturing the merchandise. These factories have always offered their goods for sale at the factory offices at ex-factory prices, packed for shipment to the United States.

Deponent further declares based upon his experience that the various manufacturers listed above offered and sold their goods to anyone who wished to buy, at the ex-godown prices listed above.

The affidavit also states that, in addition to the ex-factory prices, deponent added charges for inland freight and other items; that these charges were not incurred until after the merchandise was packed ready for shipment to the United States and that "anyone who wanted to could buy the goods at the ex-factory prices given above."

There were introduced into evidence by defendant and by plaintiff in rebuttal a report of Customs Representative William G. Powell, dated August 21, 1963, an affidavit of Mr. Matsumoto, dated January 23, 1964, and an affidavit of Mr. Matsumoto, dated April 13, 1965. (Exhibits B, C, and 7, respectively.) They relate to transactions between Globemaster and the Matsumoto company in 1962 and 1963 and were introduced to show the relationship between the parties. They contain contradictory statements as to whether the Matsumoto company acted as buying agent or was the seller of the merchandise.

There were also received in evidence reports of Mr. Powell, dated August 22, 1963, and February 4, 1964, an affidavit of Kiyoshi Hirano, dated April 13, 1965, and copies of correspondence between Kyoko Trading Co., Inc., and Globemaster. (Exhibits D, E, 8, and 9, respectively.) These relate to transactions between Globemaster and another trading company in Japan.

Plaintiff claims that the appraisement is severable and that it may rely upon the presumption of correctness attaching to the appraiser's valuation without the necessity of proof that the ex-factory prices comply with the statutory definition of export value, citing *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371; *United States* v. *Freedman & Slater, Inc.*, 25 CCPA 112, T.D. 49241; *United States* v. *Schroeder & Tremayne, Inc., et al.*, 41 CCPA 243, C.A.D. 558; *United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71; *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145. In the case last cited, the court pointed out:

* * * where merchandise is offered for sale and sold on an f.o.b. port of exportation basis, and is never sold or offered for sale at ex-factory prices, the inland charges incurred in transporting merchandise from the factory to the f.o.b. point form an integral part of the value of such merchandise. Where, however, ex-factory sales are shown, and it is established that such or similar merchandise is freely offered for sale to all purchasers, in the usual wholesale quantities and in the ordinary course of trade, at ex-factory prices, freight and other charges subsequently accruing are not elements entering into the determination of export value. * * *

Nevertheless, the burden still rests upon plaintiff to establish that the merchandise is freely sold to all purchasers at prices which do not include the disputed charges. *United States* v. *Gitkin Co.*, 46 Cust Ct. 788, A.R.D. 132; *Louis Goldey Co., Inc.* v. *United States*, 55 Cust. Ct. 759, A.R.D. 196; *Renee Antiques, Inc, et al.* v. *United States*, 56 Cust. Ct. 646, Reap. Dec. 11151; *Pan American Import Corp. et al.* v. *United States*, 58 Cust. Ct. 608, R.D. 11269.

In the instant case, there is evidence that B & W required that ex-factory prices be shown on the purchase orders and invoices and demanded a breakdown of costs or estimated costs from the Matsumoto

company. But it is not clear that the purchase was actually made or that the merchandise was actually sold to all purchasers at ex-factory prices. The agreement, dated October 3, 1959, which apparently was in effect when the merchandise here involved was ordered, directs the Matsumoto company to quote prices f.o.b. Japanese port and requires that the confirmation show both the ex-factory prices at which the goods were purchased and the f.o.b. Japanese port prices. The agreement of May 1, 1961, in effect when the merchandise was shipped, states that the Matsumoto company will purchase at ex-factory prices plus additional charges and that price quotations will always show these amounts. The figures on the purchase orders for the costs to the Japanese port were estimated and not actual. Mr. Matsumoto's affidavit of June 8, 1964, does not list ex-factory prices, but ex-godown prices, which include the inland freight to warehouse. This affidavit states variously that the factories have always offered their goods at ex-factory prices; that they offered and sold their goods to anyone who wished to buy, at the ex-godown prices; that anyone who wanted to could buy the goods at the ex-factory prices "given above." However, no ex-factory prices appear in the affidavit. In Mr. Matsumoto's affidavit of April 13, 1965, offered in evidence by plaintiff, he stated that his instructions were to buy at ex-factory prices and that he tried to comply, but that he had placed orders at ex-godown prices which were not always the equivalent of prices mentioned in Globemaster's purchase sheets. The ex-godown prices given in Mr. Matsumoto's affidavit are not the same as the ex-factory prices plus inland freight given in the purchase order. For instance, the ex-godown price for the white rubber mallets given in the affidavit is ¥960 per dozen, which, converted at 360 yen per dollar equals $2.666. The ex-factory price on the purchase order sheet is $2.60 per dozen and the inland freight $0.043. The ex-godown price, therefore, must have included some other charge or it was not computed at all on the basis of an ex-factory cost plus charges. No affidavits of the manufacturers, no pricelists, or other evidences of sales have been presented. Mr. Bernstein appears to have had no knowledge of or interest in the bills for inland freight or how the merchandise was transported to the warehouse in Kobe. It is evident from his statements that he did not believe his company assumed any risk of loss until the merchandise arrived on board the ship.

This evidence is inconsistent with plaintiff's contention that the merchandise was actually purchased by B & W ex-factory or that it was freely sold by the manufacturers ex-factory and fails to estabtablish what the ex-factory price was, if any.

There remains for consideration the 5 percent claimed to be a buying commission. It is well settled that a *bona fide* buying commission, which is not a part of the actual market value of the goods and which

does not inure to the benefit of the seller, is not a dutiable item. *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T.D. 31007; *United States* v. *Alfred Kohlberg, Inc.*, 27 CCPA 223, C.A.D. 88; *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590. However, where the relationship between the parties is that of buyer and seller rather than principal and agent, an item claimed to be a "buying commission" is not deductible. *Pan Pacific Importers, Ltd.* v. *United States*, 10 Cust. Ct. 530, Reap. Dec. 5804; *Samuel S. Perry* v. *United States*, 24 Cust. Ct. 546, Reap. Dec. 7794; *Morris Friedman* v. *United States*, 52 Cust. Ct. 660, A.R.D. 178; *Fine Arts Bag Co.* v. *United States*, 57 Cust. Ct. 625, R.D. 11224. It is, therefore, incumbent on plaintiff to establish that a *bona fide* buying commission exists. *Manhattan Novelty Corp.* v. *United States*, 54 Cust. Ct. 528, Reap. Dec. 10906.

The agreements of May 1, 1961, and October 3, 1959, between B & W and the Matsumoto company provide for the latter to undertake duties usual for buying agents, such as visiting manufacturers, collecting samples, providing regular reports pertaining to the market, quoting prices, inspecting merchandise, and arranging shipment. The duty of providing regular reports, however, was not carried out. The agreements state that the Matsumoto company is to place orders upon instructions from B & W and shall have no authority to bind it except upon written authorization, but Mr. Bernstein testified that the Matsumoto company had the legal right to place orders with anyone it wanted. Mr. Bernstein also stated in connection with his visit to Mr. Matsumoto's office in Japan:

Q. And, did Mr. Matsumoto have samples of these items?—A. He procured samples for us, yes.

Q. From whom did you purchase these items then?—A. From Mr. Matsumoto.

Mr. Matsumoto's affidavit of January 23, 1964, states:

If Globemaster, Inc., Minneapolis, decides not to purchase merchandise purchased by my company from the manufacturers, then my company is free to sell this merchandise to other customers. Payment is made by Globemaster, Inc., to my company in full FOB amounts.

Although the duties of the Matsumoto company included the quotation of prices and the inspection of merchandise, B & W also employed a resident agent on a commission basis, first Paul R. Brown and later Globemaster, with the same duties.

These facts militate against the view that the Matsumoto company was acting as B & W's buying agent.

I conclude that the record presented with the discrepancies and contradictions noted does not support plaintiff's contention that the merchandise was purchased by B & W from the various manufacturers at

the claimed ex-factory prices or that the Matsumoto company was a *bona fide* buying agent rather than the seller of the merchandise. The appraiser's finding of value is, therefore, sustained.

I find as facts:

1. That the merchandise involved herein consists of metal squares, rubber mallets, artists' brushes, and vinyl kits and bags imported from Japan and entered at the port of Houston on October 4, 1961.

2. That said merchandise was entered at ex-factory unit prices.

3. That the merchandise was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at the invoice unit values, plus charges marked "X," that is 5 percent buying commission, inland freight, storage, inland insurance, inspection charges, hauling and lighterage, and petties.

4. That plaintiff challenges only the addition of the buying commission and other charges.

5. That the evidence presented does not support plaintiff's contention that the merchandise was actually purchased ex-factory or that it was freely sold by the manufacturers ex-factory and does not establish what the ex-factory price was, if any.

6. That the record fails to establish the *bona fides* of an alleged buying agency between the shipper and the importer.

I conclude as matters of law:

1. That the evidence is insufficient to overcome the presumption of correctness attaching to the appraiser's valuation.

2. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the involved merchandise.

3. That said value is represented by the appraised values.

Judgment will be entered accordingly.