(A.R.D. 262)

B & W WHOLESALE CO., INC. v. UNITED STATES

Entry No. 3810–H.

Third Division, Appellate Term

(Decided November 3, 1969)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the appellant. *William D. Ruckelshaus*, Assistant Attorney General (*Glenn E. Harris* and *Morris Braverman*, trial attorneys), for the appellee.

Before RICHARDSON and LANDIS, Judges

RICHARDSON, Judge: This application was filed by the importer for a review of the decision and judgment of a single judge sitting in reappraisement in *B & W Wholesale Co., Inc.* v *United States*, 58 Cust. Ct. 728, Reap. Dec. 11311 (1967), and holding that export value as appraised is the proper dutiable value of metal squares, rubber mallets, artists' brushes and vinyl kits and bags exported from Japan in August, 1961. The merchandise was entered at various ex-factory prices shown on the commercial invoice which were subsequently

advanced under an appraisement reading: "Appraised at invoice unit values, plus charges marked X." The charges referred to in the appraisement are set forth in the invoice as follows:

CHARGES

| | |
|---|---:|
| 5% buying commission ($69.29) | ¥24, 944. 00 |
| Inland freight | 10, 000. 00 |
| Storage | 830. 00 |
| Inland Insurance | 750. 00 |
| Inspection charges | 5, 200. 00 |
| Hauling & Lighterage | 8, 900. 00 |
| Petties | 1, 000. 00 |
| | ¥51, 624. 00 |
| | $143. 40 |

Appellant contended below and contends here that the buying commission and inland charges are non-dutiable and as such should not have been included in the appraised value of the merchandise. The issue presented in the instant application is whether there is any substantial evidence (1) that the alleged buying commission is *bona fide;* and (2) that the merchandise was offered for sale in accordance with statutory export value at the claimed ex-factory prices.

The record shows that a purchase order for the involved merchandise was placed by or on behalf of appellant with the M. Matsumoto Co., Ltd., of Osaka, Japan, the alleged buying agent, on or about April 1, 1961, apparently pursuant to the terms of an alleged buying agency agreement dated October 3, 1959, between appellant and other interrelated companies acting through an agent on one side, and the said Matsumoto Co. on the other side, which agreement was received in evidence as defendant's collective exhibit A.* The terms of exhibit A read as follows:

This Agreement will serve to confirm our understanding as follows:

B & W Wholesale Supply Co. Inc., B & W Atlanta Corp., Denver Tool Co., Northwest Tool Co., Perwien Tool and Supply Co. Inc., and B & W Southwest Corporation hereby appoint the firm of M. Matsumoto & Co. Ltd. Kobe, Japan, as buying agents in Japan.

M. Matsumoto & Co. Lts. [sic] Kobe, will visit manufacturers in Japan, collect samples, submit said samples to above named companies, provide regular reports pertaining to the market and quote prices at which the merchandise may be purchased.

Upon instructions from the above named companies, M. Matsu-

---

* A Subsequent agreement dated May 1, 1961, is in evidence as plaintiff's exhibit 1, but does not appear to affect the importation at bar by reason of the date of placement of the order.

*moto & Co. Ltd.*, will place orders with manufacturers, inspect merchandise and arrange shipment.

M. Matsumoto & Co. Ltd. will be entitled to a buying commission at the rate of 5% on first cost, Ex. Factory Japan.

M. Matsumoto & Co. Ltd., will purchase merchandise on the basis of ex-factory price plus the additional charges totaling the final cost such as case and packing, inland freight to port of shipment, insurance to steamer, storage, hauling and lighterage, buying commission, etc.

In order to avoid misunderstandings of price quotations when communicating, it is hereby agreed that the M. Matsumoto & Co. Ltd., will quote the above named companies, the cost of the merchandise F.O.B. Japan port in United States Dollars. Such quotations shall always include the buying commission. However, the confirmation must always show the price ex-factory at which the goods were purchased and the F.O.B. Japan Port price.

This contract shall be in effect as of October 3rd, 1959, and shall continue until one year after written notification by one of the parties expressing their desire to discontinue this agreement.

The buying agent shall have no authority to bind the above named companies except upon receipt of written order or authorization of the said companies.

It is understood and agreed that the Agency hereby created is not exclusive.

The signatures to this agreement are not visible on the document placed in evidence. But the document does give evidence of having been signed by the signatories.

The purchase order herein, received in evidence at the trial below as plaintiff's exhibit 4, covers merchandise in the case at bar as well as other merchandise not here involved, and calls for delivery to appellant's affiliate company, B & W Southwest Corp. of Houston, Texas. In addition to the contract and the purchase order aforesaid, there is extensive documentary evidence as well as some testimonial evidence in the record. However, the subject merchandise was exported, according to the invoice, on August 21, 1961, and the only other documentation in the record relating to this period of exportation other than a check given in payment for the involved merchandise appears to be an affidavit executed under date of June 8, 1964, by one Masami Matsumoto and received in evidence as plaintiff's exhibit 6. Exhibit 6 reads in relevant part as follows:

Masami MATSUMOTO being first duly sworn, deposes and says:

1. He is a resident of ASHIYA, Japan and has his principal place of business at 2-Chome, Sakaemachi-Dori, Ikuta-Ku, Kobe,

Japan and, among other things, has been in the business of buying agent of tools and miscellaneous sundries since the year 1961.

\* \* \* \* \* \* \*

4. . . . The services rendered by M. Matsumoto & Co., Ltd. consisted of services such as visiting manufacturers, collecting samples and submitting samples to B & W Wholesale Supply Co. with price quotations, placing orders with the maker, inspecting the merchandise, and arranging for shipment of the goods, for all of which M. Matsumoto & Co., Ltd. received full FOB amount including buying commission.

5. M. Matsumoto & Co., Ltd. places all orders on behalf of B & W Wholesale Supply Co. and its affiliates on the basis of ex-factory prices plus the inland freight to warehouse. (This is called ex-godown). All invoices to B & W Wholesale Supply Co. are made out on the basis of ex-factory prices stated in Purchase Order, and the invoices list all charges such as buying commission, shipping charges (estimated) and any other charges (all estimated) which will be incurred after the goods are packed ready for shipment from the factory, and this has always been the case with all shipments from M. Matsumoto & Co., Ltd. to B & W Wholesale Supply Co. or B & W Southwest Corporation.

\* \* \* \* \* \* \*

8. At the time of exportation of the goods listed above the principal market for the sale of the goods was and all times has been at the respective factories manufacturing the merchandise. These factories have always offered their goods for sale at the factory offices at ex-factory prices, packed for shipment to the United States.

9. Deponent further declares based upon his experience that the various manufacturers listed above offered and sold their goods to anyone who wished to buy, at the ex-godown prices listed above.

10. The ex-godown prices listed above were for any quantity purchased.

\* \* \* \* \* \* \*

12. In addition to the ex-factory prices, deponent added the following charges to Invoice 548:

\* \* \* \* \* \* \*

The foregoing charges were not incurred until after the merchandise was packed ready for shipment to the United States; and anyone who wanted to could buy the goods at the ex-factory prices given above.

It was brought out in testimony elicited from Robert L. Bernstein, appellant's treasurer and vice president and the person who signed the purchase order covering the merchandise at bar, that said purchase order was acknowledged in writing by the Matsumoto company. It

is to be noted in this connection that the order itself directs acknowledgement be given by the "Supplier." Mr. Bernstein testified that the various amounts shown in the heading of said purchase order, received in evidence as plaintiff's collective exhibit 4, namely, f.o.b. factory cost and buying commission, inland freight, etc., were given to him by the Matsumoto company, that the amounts shown thereon as f.o.b. factory cost and buying commission were the actual figures, and the inland freight and warehouse charges, etc. were estimated, and that the total invoice of $1,529.20 was remitted to Matsumoto. But at one point the witness testified on cross-examination (R. 17) :

Q. Would you place the orders for the merchandise?—A. I. would.

Q. How would you place these orders? Otherwise, what negotiations would you engage in or process or what meetings would you engage in before you placed your orders? How many did you go to see?—A. We would go to see trading companies, makers, anybody who would offer merchandise.

Q. With regard to the invoice which is the subject of this litigation, how many did you see in order to purchase the items that have been introduced in evidence as Plaintiff's Illustrative Exhibits 2, 3, and 4?—A. Mr. Matsumoto's Company.

Q. Was his company the manufacturer of these items?—A. No, sir.

Q. And, did Mr. Matsumoto have samples of these items?— A. He procured samples for us, yes.

Q. From whom did you purchase these items then?—A. From Mr. Matsumoto.

And it was also brought out on cross-examination of Mr. Bernstein, who testified on appellant's behalf, that he did not receive bills for inland freight, that he did not require Matsumoto to substantiate such charges, that he had no knowledge of how the goods arrived in Kobe or as to who made arrangements for inland freight, and that Matsumoto had the legal right to place appellant's orders with any factory it chose. And when asked whether he would have recourse to the manufacturer in the event of loss or pilferage, Mr. Bernstein testified (R. 30) :

According to my best belief, we don't take possession of the merchandise until it gets into a warehouse in Kobe. I don't believe we take possession until it gets on board ship.

On the basis of the foregoing as well as other evidence the trial court concluded that the record failed to support appellant's contention that the merchandise at bar was purchased by it from the manufacturers at

the claimed ex-factory prices, or that the Matsumoto company was its *bona fide* buying agent, and, accordingly, sustained the appraised values.

On the matter of the buying agency the trial court stated (58 Cust. Ct. at page 734) :

> The agreements of May 1, 1961, and October 3, 1959, between B & W and the Matsumoto company provide for the latter to undertake duties usual for buying agents, such as visiting manufacturers, collecting samples, providing regular reports pertaining to the market, quoting prices, inspecting merchandise, and arranging shipment. The duty of providing regular reports, however, was not carried out. The agreements state that the Matsumoto company is to place orders upon instructions from B & W and shall have no authority to bind it except upon written authorization, but Mr. Bernstein testified that the Matsumoto company had the legal right to place orders with anyone it wanted. . . .

The trial court then called attention to Berstein's testimony wherein he admitted to purchasing the merchandise from Matsumoto, and, among other things, to the fact that at the time in question appellant had also employed in Japan on a commission basis a resident agent named Paul R. Brown, concluding this phase of its decision with the statement that these facts militate against the view that the Matsumoto company was acting as appellant's buying agent.

And on the matter of the disputed charges the court below stated (58 Cust Ct. at pages 732–733) :

> In the instant case, there is evidence that B & W required that ex-factory prices be shown on the purchase orders and invoices and demanded a breakdown of costs or estimated costs from the Matsumoto company. But it is not clear that the purchase was actually made or that the merchandise was actually sold to all purchasers at ex-factory prices. . . . No affidavits of the manufacturers, no pricelist, or other evidences of sales have been presented. Mr. Bernstein appears to have had no knowledge of or interest in the bills for inland freight or how the merchandise was transported to the warehouse in Kobe. It is evident from his statements that he did not believe his company assumed any risk of loss until the merchandise arrived on board the ship.
>
> This evidence is inconsistent with plaintiff's contention that the merchandise was actually purchased by B & W ex-factory or that it was freely sold by the manufacturers ex-factory and fails to establish what the ex-factory price was, if any.

The instant case comes before us under some six assignments of error attacking the decision of the court below as above noted. Some of the evidence presented below and discussed in the decision of the trial court relates to a "subsequent" state of facts and involves individuals

and firms not related to the period of exportation here involved. We have not considered such evidence in disposing of this application because we believe that a "subsequent" state of facts would have no bearing on the situation which existed at the time of exportation of the merchandise in issue. *Cf. Augusta Chemical Co.* v. *United States,* 40 Cust. Ct. 845, 849, R.D. 9165 (1958). In any case, as to the evidence relating to the involved merchandise and to the period of its exportation from Japan the statements of the trial court express our views in the matter. And apart from the assessment of the evidence undertaken by the court below with which we are in accord, we are inclined to make the following observations regarding the evidence:

It is uncontradicted that the involved merchandise was purchased by Matsumoto on an *ex-godown* basis. This fact in and of itself repudiates the existence of any buying agency predicated upon an obligation of the alleged buying agent to purchase *ex-factory* in consideration of earning a buying commission. And to this fact must also be added the circumstance that in the transaction at bar there is no evidence of recognition on the part of the involved manufacturers of any buying agency, or of any obligation of the appellant to pay them for merchandise they delivered to Matsumoto. So far as appears of record these manufacturers looked solely to Matsumoto for payment for such merchandise.

And insofar as the disputed charges are concerned, we are of the opinion that the affidavit given by Matsumoto and received in evidence as plaintiff's exhibit 6 is insufficient as a matter of law as regards sales practices of the Japanese manufacturers. Apart from the fact that said affidavit is couched in only bare conclusory language of the statute on this subject, affiant Matsumoto did not establish in the affidavit his competency to know what the manufacturers' sales practices were at the time of exportation here involved. He is not shown to be connected with any of the manufacturing concerns in any way, and his relationship to them as an alleged buying agent only commenced in the same year of which he speaks in the affidavit, namely, 1961. From such poor vantage point Matsumoto is not, in our opinion, in a position to speak authoritatively on the subject of the manufacturers' sales practices in the country of exportation on the broad spectrum necessary in a reappraisement case. *Cf. United States* v. *Wiener,* 15 Ct. Cust. Appls. 428, T.D. 42594 (1928).

For the reasons stated herein we agree with the findings of fact and conclusions of law of the trial court, and we affirm the decision and judgment of that court.

Judgment will be entered herein accordingly.